**2025 IL 130470**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

───────────────

(Docket No. 130470)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
ABDUL MALIK MUHAMMAD, Appellee.

*Opinion filed July 10, 2025.*

JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Overstreet, Cunningham, and Rochford
concurred in the judgment and opinion.

Justice Neville concurred in part and dissented in part, with opinion, joined by
Justice O'Brien.

**OPINION**

¶ 1     This appeal presents us with another opportunity to interpret the Illinois Torture
Inquiry and Relief Commission Act (TIRC Act) (775 ILCS 40/1 *et seq.* (West
2018)) and, for the first time, address what evidence is needed to rescind the

appointment of a special prosecutor under the amended version of section 3-9008(a-10) of the Counties Code (55 ILCS 5/3-9008(a-10) (West 2020)). Having found sufficient evidence of torture of petitioner Abdul Malik Muhammad to merit judicial review, the Illinois Torture Inquiry and Relief Commission (Commission) referred petitioner's case to the Cook County circuit court. See 775 ILCS 40/45(c) (West 2018). There, at petitioner's request, the court appointed the Office of the Special State's Attorney, as special prosecutor, and that office included Robert Milan, a former supervising attorney in the Cook County State's Attorney's Office.

¶ 2        After two years of discovery, Milan and his office moved to terminate the judicial review proceedings, asserting the Commission acted outside its authority and unlawfully referred the matter for judicial review because petitioner did not confess to the murder or make any incriminating statements. Thereafter, petitioner moved twice to have Milan's appointment as special prosecutor rescinded, and the court denied both motions. After responsive briefing, the court held a hearing on the motion to terminate and granted it.

¶ 3        Petitioner appealed, challenging both the termination of the proceedings under the TIRC Act and the denial of his motions to rescind the appointment of Milan. The appellate court agreed with petitioner on both matters, reversed the circuit court's orders, and remanded the cause with directions on how to handle an alleged violation based on *Brady v. Maryland*, 373 U.S. 83 (1963). The State now appeals the appellate court's reversal of both orders. For the following reasons, we find the appellate court properly reversed the termination of the proceedings under the TIRC Act but erred by reversing the circuit court's denial of petitioner's motions to rescind Milan's appointment. We also clarify the appellate court's directions regarding the alleged *Brady* violation.

¶ 4                                    I. BACKGROUND

¶ 5                    A. Underlying Facts Through Petitioner's Direct Appeal

¶ 6        On May 4, 1999, Damone Mims was shot to death while sitting in his car. The next month, an arrest warrant was issued for petitioner in relation to Mims's death. On April 27, 2000, Chicago police detectives David Fidyk and Mike McDermott went to Seattle, Washington, and brought petitioner back to Area 2 of the Chicago

Police Department (Area 2), where they interrogated him. In June 2000, a grand jury indicted petitioner on three counts of first degree murder (720 ILCS 5/9-1(a)(1)-(3) (West 1998)) and two counts of aggravated discharge of a firearm (*Id.* § 24-1.2(a)(2)) for Mims's death. However, at his November 2001 trial, the State elected to only prosecute petitioner on the intentional and knowing first degree murder charges.

¶ 7      The only detective from Area 2 to testify at petitioner's trial was Detective Fidyk. He testified that petitioner made an oral statement, during which he denied knowledge of Mims's murder and of an earlier aggravated battery incident in which petitioner was beaten by Black Disciples. According to Detective Fidyk, petitioner also stated he knew there was an arrest warrant for him regarding the shooting and he decided to move to Washington to turn his life around. Detective Fidyk also testified about a lineup, in which Glenn Davis identified petitioner. Additionally, he testified a report was written about petitioner's statements by Detective McDermott. During closing arguments, the State argued petitioner ran away to another state after the crime because he was conscious of his own guilt. The State further noted that petitioner acknowledged to the detectives he knew about the warrant and left to turn his life around.

¶ 8      At the conclusion of the trial, the jury found petitioner guilty of first degree murder. The circuit court sentenced petitioner to 50 years' imprisonment. Petitioner appealed, asserting (1) his trial counsel provided ineffective assistance of counsel, (2) the circuit court erred by denying petitioner's request for new counsel, and (3) his 50-year sentence was excessive. The appellate court affirmed petitioner's conviction and sentence. *People v. Muhammad*, 346 Ill. App. 3d 1177 (2004) (table) (unpublished order under Illinois Supreme Court Rule 23). This court denied petitioner's petition for leave to appeal. *People v. Muhammad*, 216 Ill. 2d 718 (2005) (table).

¶ 9                        B. Petitioner's Postconviction Petition

¶ 10      In June 2006, petitioner filed a *pro se* postconviction petition, in which he again alleged ineffective assistance of counsel and sentencing errors. However, he did not raise any allegations regarding the Area 2 detectives. The circuit court summarily dismissed the petition. The appellate court affirmed. *People v. Muhammad*, 381 Ill.

App. 3d 1138 (2008) (table) (unpublished order under Illinois Supreme Court Rule 23). This court again denied petitioner's petition for leave to appeal. *People v. Muhammad*, 233 Ill. 2d 585 (2009) (table).

¶ 11                    C. Petitioner's Petition for Writ of *Habeas Corpus*

¶ 12    In March 2010, petitioner filed a petition for writ of *habeas corpus*, raising five claims. *United States ex rel. Muhammad v. Gaetz*, No. 10 C 1954, 2010 WL 5372730, at *1 (N.D. Ill. Dec. 15, 2010). As noted by the Commission, in support of one of his claims, petitioner alleged the Chicago police illegally detained him for more than 48 hours and the detectives interrogating him failed to afford him counsel despite his requests. Petitioner also described being held by the arm by detectives before or during two lineups. Ultimately, the district court denied petitioner's *habeas corpus* petition. *Id.* at *5.

¶ 13                    D. Petitioner's Torture Claim Before the Commission

¶ 14    In July 2014, petitioner sent a letter to the Commission, alleging he suffered torture at the hands of Area 2 detectives during their interrogation of him regarding Mims's death. In its case disposition memorandum, the Commission highlighted the following claims raised by petitioner in that letter: (1) he had been "interrogated for four days at Area 2 in a cell that did not have a bed, food, toilet, or water"; (2) "Detective McDermott threatened him, boasting that he '*kn[ew] how to get [petitioner] to confess without leaving a mark*'" (emphasis in original); (3) Detective McDermott "aggressively slammed a large casefile on the table, closed the interrogation room door and told his colleagues *** that he needed a moment alone with [petitioner]," and when alone with petitioner, Detective McDermott used racial intimidation by telling him that "a jury would be more likely to believe white witnesses than a black defendant"; and (4) during two of the four lineups, petitioner was "forcefully held by the arm." In an August 2014 letter, petitioner further alleged that (1) he did not make the statements that police attributed to him, (2) he made no statements at all, (3) he was forced to sleep on the hard floor while handcuffed, and (4) the police used " 'subtle tactics' " to break him. The Commission investigated petitioner's claims, which included interviewing petitioner, his trial attorney, and eyewitnesses to the shooting of

Mims. When interviewed by Commission staff, petitioner alleged that he was actually beaten on his head with a case file by Detective McDermott, denied food, and forced to urinate on the floor and to defecate into a shirt in the interrogation room because he was denied access to the bathroom.

¶ 15        In a June 2018 memorandum, the Commission concluded that, pursuant to section 45(c) of the TIRC Act (775 ILCS 40/45(c) (West 2018)), there was sufficient credible evidence of torture to merit judicial review of petitioner's claim of torture, and the Commission referred the matter to the Cook County circuit court. In its "jurisdictional analysis" section, the Commission cited the statutory definition of "claim of torture" (775 ILCS 40/5(1) (West 2014)) and its administrative rule defining "tortured confession" (20 Ill. Adm. Code 2000.10 (2017)). The Commission noted both (1) Detective Fidyk's testimony regarding statements made by petitioner and (2) the fact those statements were used in closing arguments as proof of petitioner's consciousness of guilt. It found the fact petitioner had denied making such statements was not disqualifying under its definition of tortured confession. As to the evidence of torture, the Commission found that, despite the Commission's severe reservations about petitioner's credibility regarding his claims of physical abuse, there is enough evidence of misconduct by the State to warrant further review by a court. It noted petitioner had consistently and repeatedly raised the claims that his requests for counsel were disregarded and he was subject to multiple unsuccessful lineups. Moreover, the Commission found judicial review was warranted based on the "apparent *Brady* violation" regarding the negative lineups, which discredits the State in general, and the documented findings by judges against Detective McDermott's credibility.

¶ 16                                E. Circuit Court Review

¶ 17        In the circuit court, petitioner filed a motion for the assignment of a judge who was not previously an assistant state's attorney, citing the Cook County State's Attorney's Office's recusal from prosecuting any Chicago police torture cases. The matter was assigned to Judge Lawerence Flood. Petitioner then filed a motion to appoint a special prosecutor, noting the Cook County State's Attorney's Office had a conflict in petitioner's case because one of the individuals accused of torture, Detective McDermott, had worked as an investigator for that office. Petitioner

served his motion on Milan and Michael O'Rourke of the Office of the Special State's Attorney. The court granted petitioner's motion. The parties then engaged in discovery.

¶ 18    In August 2020, Milan and Matthew McQuaid of the Office of the Special State's Attorney filed a motion to terminate the proceedings, asserting the Commission acted outside its authority and unlawfully referred the matter to the circuit court. Milan asserted petitioner's statements to Detective Fidyk were not a "confession" under the TIRC Act. Specifically, he asserted that the Commission improperly expanded the statutory definition of confession to include statements that did not admit the crime for which petitioner was charged. Milan also argued petitioner's statement was not incriminating, the State did not use the statement to obtain petitioner's conviction, and the Commission overstepped its authority by addressing an alleged *Brady* violation in this case.

¶ 19    In November 2020, petitioner filed a motion to rescind the appointment of Milan as special prosecutor. The motion asserted (1) the circuit court did not comply with section 3-9008 of the Counties Code (55 ILCS 5/3-9008 (West 2020)) in appointing Milan and (2) Milan had an actual or apparent conflict because he had been a high-ranking attorney in the Cook County State's Attorney's Office at the time of the alleged wrongdoing in this case. Milan filed a response, asserting petitioner was " 'prosecutor-shopping' " and denying he had any involvement in petitioner's case when he worked for the Cook County State's Attorney's Office. After a December 2020 hearing, the circuit court denied the motion to rescind, noting concerns about petitioner's long delay in bringing the motion and finding his appointment of Milan consistent with the statute and prior appointments. Petitioner filed a motion to reconsider, which was struck when a different judge was assigned to the case.

¶ 20    In April 2021, petitioner filed a second motion to rescind Milan's appointment, asserting Milan would be a necessary witness at the evidentiary hearing based on a newly discovered March 1999 memorandum from an assistant state's attorney to Milan, regarding the treatment of a suspect in Area 4 of the Chicago Police Department. In the State's response, Milan asserted the memorandum was irrelevant, noting it involved another area of the Chicago Police Department and different detectives. Petitioner filed a reply and attached the affidavit of Andrew

Kent, whose expert opinion was that Milan has a conflict of interest under Rule 1.7(a)(2) (Ill. R. Pro. Conduct (2010) R. 1.7(a)(2) (eff. Jan. 1, 2010)). In support of that opinion, Kent did cite Rule 5.1(b) (Ill. R. Pro. Conduct R. 5.1(b) (eff. Aug. 1, 1990)) and pointed out a supervisor could be subject to discipline if he or she did not make reasonable efforts to ensure that supervisees acted ethically. After hearing oral arguments, the circuit court denied petitioner's second motion to rescind, finding petitioner had not presented sufficient evidence that Milan had a conflict of interest in this case. The court noted that, if petitioner could show Milan's actual or direct participation in petitioner's prosecution, then he could again present the matter to the court.

¶ 21    After the denial of the motions to rescind, petitioner filed a response to the motion to terminate the proceedings, in which he argued that (1) his alleged statement to Detective Fidyk constituted an inculpatory statement used by the prosecution to establish his consciousness of guilt, (2) that statement fell within the Commission's definition of a confession, (3) Milan waived challenging the propriety of the Commission's referral for judicial review by waiting over two years to file the motion to terminate, and (4) the Commission could rely on the alleged *Brady* violations as corroboration of his claims of abuse. The parties each filed another document supporting their position on the motion to terminate.

¶ 22    The circuit court heard the parties' arguments and took the matter under advisement. On March 11, 2022, the court announced its judgment, granting the motion to terminate the proceedings. Specifically, it considered whether there was a proper claim of torture under the TIRC Act. The court found petitioner's statement to Detective Fidyk was not a confession based on case law. It also questioned the consideration of the alleged *Brady* violations in determining the claim of torture.

¶ 23    After the proceedings under the TIRC Act, the circuit court granted petitioner leave to file his successive postconviction petition. Later, it did terminate Milan's appointment only for the postconviction petition proceedings.

F. Appellate Court

¶ 25        Petitioner appealed, arguing the circuit court erred by (1) dismissing his claim of torture without an evidentiary hearing and (2) refusing to remove Milan due to an actual conflict of interest. The appellate court agreed with both contentions and instructed the circuit court that, at the evidentiary hearing on remand, it should decide the merits of petitioner's claim that he was tortured into giving the statement, as well as the possible *Brady* violation related to the multiple lineups in which the witnesses did not identify petitioner. 2023 IL App (1st) 220372, ¶¶ 5-6. One justice dissented on the issue of Milan's removal as special prosecutor. *Id.* ¶ 129 (Tailor, J., concurring in part and dissenting in part).

¶ 26        As to the dismissal of petitioner's claim of torture, the appellate court first determined the word " 'confession' " used in the TIRC Act's definition of "claim of torture" was ambiguous because reasonably well-informed people reading the TIRC Act could understand " 'confession' " in more than one sense. *Id.* ¶ 64 (majority opinion). It then found the Commission's interpretation of " 'tortured confession' " was reasonable based on both recent Illinois court interpretations of " 'confession' " and the legislature's intent as explained by the TIRC Act's purpose, which was to establish " 'an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture.' " *Id.* ¶ 65 (quoting 775 ILCS 40/10 (West 2020)). Last, the appellate court concluded petitioner's statement to Detective Fidyk qualified as a " 'tortured confession' " under the Commission's interpretation of the TIRC Act. *Id.* ¶ 67. Thus, the appellate court remanded the cause to the circuit court to conduct an evidentiary hearing to determine the merits of petitioner's claim that he was tortured into giving the statement. *Id.*

¶ 27        The appellate court then chose to address petitioner's contention the circuit court erred by failing to consider the Commission's finding of a possible *Brady* violation because it was likely to recur on remand. *Id.* ¶ 69. It found that, "[b]ecause the alleged *Brady* violation is closely tethered to the merits of [petitioner]'s torture claim, we reject Milan's contention that the potential *Brady* violation is irrelevant to [petitioner]'s torture claim and could not be raised under the [TIRC] Act." *Id.* ¶ 77.

¶ 28    Regarding petitioner's motions to rescind Milan as the special prosecutor, the majority applied the *de novo* standard of review because the facts were not in dispute. *Id.* ¶ 81. It found section 3-9008(a-10) of the Counties Code (55 ILCS 5/3-9008(a-10) (West 2020)) applied to the removal of a special prosecutor. 2023 IL App (1st) 220372, ¶ 91. However, the majority declined to determine whether section 3-9008(a-10) required an actual conflict of interest and not just the appearance of impropriety because Milan had an actual conflict of interest. *Id.* ¶ 88. In finding an actual conflict of interest, the majority examined case law regarding the role of the prosecutor. *Id.* ¶ 92. It found the undisputed facts showed Milan exercised a quasi-judicial power as supervisor of the felony review unit in the Cook County State's Attorney's Office, which charged petitioner with first degree murder, and his role as special prosecutor on the claim of torture gave him the improper ability to "judge" the validity of "his original decision to prosecute," as well as his actions and the actions of his subordinates. *Id.* ¶ 94. The majority concluded "[d]ue process does not tolerate the 'risk of actual bias' that Milan presents." *Id.* ¶ 96. It declared failing to replace Milan as special prosecutor would undermine the integrity of the court. *Id.*

¶ 29    While the majority recognized the conflict petitioner alleged did not fit squarely within the type of conflicts recognized in the Illinois Rules of Professional Conduct of 2010, it found support in some of those rules for rescinding Milan's appointment. *Id.* ¶ 106. It noted that Rule 1.7 "prohibits a lawyer from representing a client in a matter that 'involves a concurrent conflict of interest.' " *Id.* ¶ 107 (quoting Ill. R. Pro. Conduct (2010) R. 1.7(a) (eff. Jan. 1, 2010)). The majority found Milan's representation of the State as a special prosecutor was materially limited by his personal interest in protecting his reputation. *Id.* ¶ 109. Moreover, it noted that, pursuant to Rule 5.1(b) (Ill. R. Pro. Conduct (2010) R. 5.1(b) (eff. Jan. 1, 2010)), Milan had an ethical duty to supervise the attorneys "under his watch" and thus Milan could be subject to discipline for failing to make reasonable efforts to ensure those attorneys act ethically. 2023 IL App (1st) 220372, ¶ 110.

¶ 30    In disagreeing with the majority, Justice Tailor suggested the abuse of discretion standard of review was the appropriate standard, noting that, even where the facts were undisputed, a circuit court still had discretion in making certain decisions. *Id.* ¶ 136 (Tailor, J., concurring in part and dissenting in part). He pointed out that petitioner never argued Milan's appointment as special prosecutor violated

his due process rights and, thus, petitioner forfeited that claim. *Id.* ¶ 133. He also addressed the issue on the merits and explained how the majority's analysis was flawed. *Id.* ¶¶ 162-65. Justice Tailor further explained that the appearance of impropriety was no longer sufficient to establish that a prosecutor harbors an actual conflict of interest under section 3-9008. *Id.* ¶ 146. As to the facts of this case, he found petitioner had failed to meet his burden because he did not present any evidence that Milan played any role in petitioner's interrogation or prosecution for Mims's murder. *Id.* ¶ 149. Justice Tailor noted the majority cited no actual facts tying Milan to petitioner's torture or subsequent prosecution and relied solely on the fact that Milan held a supervisory position in the state's attorney's office and engaged in speculation and supposition in finding that Milan had an actual conflict. *Id.* ¶ 150. He further found Milan did not suffer a conflict of interest under Rule 1.7(a)(2) or Rule 5.1(b) of the Illinois Rules of Professional Conduct of 2010. *Id.* ¶ 155. Finally, Justice Tailor noted the majority conveniently ignored the well-reasoned decisions regarding the suspicious timing of petitioner's motions to rescind Milan's appointment. *Id.* ¶ 169.

¶ 31 We granted the State's petition for leave to appeal pursuant to Illinois Supreme Court Rule 315(a) (eff. Dec. 7, 2023).

¶ 32 II. ANALYSIS

¶ 33 A. Motion to Terminate Proceedings Under the TIRC Act

¶ 34 The State alleges the appellate court erred by applying the Commission's definition of "tortured confession" and then finding petitioner's statements to Detective Fidyk qualified as a "tortured confession." The State also asserts the Commission lacked authority to refer petitioner's claim because he denied providing a statement to the police as a result of the torture. Petitioner contends the appellate court properly applied the Commission's definition of "tortured confession" and determined he was entitled to an evidentiary hearing.

¶ 35 Like *People v. Fair*, 2024 IL 128373, ¶ 61, our only other case addressing the TIRC Act, the parties' arguments present competing interpretations of the act. This court reviews *de novo* matters of statutory construction. *Id.* When construing a statute, we apply the following principles:

"The primary objective of statutory construction is to ascertain and give effect to the intent of the legislature. The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning. [Citation.] We view the statute as a whole, construing words and phrases in connection with other relevant statutory provisions rather than in isolation, while giving each word, clause, and sentence of a statute a reasonable meaning, if possible, and not rendering any term superfluous. [Citation.] A reviewing court may also consider the underlying purpose of the statute's enactment, the evils sought to be remedied, and the consequences of construing the statute in one manner versus another." (Internal quotation marks omitted.) *Id.*

Additionally, courts presume that the legislature did not intend to cause absurd, inconvenient, or unjust results. *People v. Garcia*, 241 Ill. 2d 416, 421 (2011).

¶ 36         Section 5 of the TIRC Act defines a "claim of torture" as the following:

"a claim on behalf of a living person convicted of a felony in Illinois asserting that he was tortured into *confessing to the crime* for which the person was convicted and the *tortured confession* was used to obtain the conviction and for which there is some credible evidence related to allegations of torture." (Emphases added.) 775 ILCS 40/5(1) (West 2018).

The parties disagree as to the definition of "tortured confession."

¶ 37         Petitioner contends the appellate court properly applied the Commission's definition of "tortured confession" contained in the Illinois Administrative Code, which provides the following:

" 'Tortured Confession' includes any incriminating statement, vocalization or gesture alleged by police or prosecutors to have been made by a convicted person that the convicted person alleges were a result of (or, if the convicted person denies making the statements, occurred shortly after) interrogation that the convicted person claims included torture. (See 775 ILCS 40/5(1).)" 20 Ill. Adm. Code 2000.10 (2017).

¶ 38         Even when our review is *de novo*, "an agency's interpretation of its regulations and enabling statute are entitled to substantial weight and deference, given that agencies make informed judgments on the issues based upon their experience and

expertise and serve as an informed source for ascertaining the legislature's intent." (Internal quotation marks omitted.) *Mercado v. S&C Electric Co.*, 2025 IL 129526, ¶ 21.

¶ 39    Conversely, the State notes the dictionary definition of confession, as well as criminal cases distinguishing a confession from an admission. The Merriam-Webster Online Dictionary contains three different definitions for confession, one of which defines the term as "a statement of what is confessed: such as a : a written or oral acknowledgment of guilt by a party accused of an offense[;] b : a formal statement of religious beliefs : creed." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/confession (last visited May 5, 2025) [https://perma.cc/Y9D8-E8RV]. Like confession, "confess" has multiple definitions, including "to tell or make known (something, such as something wrong or damaging to oneself)." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/confess (last visited May 5, 2025) [https://perma.cc/5FL9-4PHQ]. Black's Law Dictionary defines "confession" as "a criminal suspect's oral or written acknowledgment of guilt, often including details about the crime." Black's Law Dictionary (12th ed. 2024). It also notes two different definitions of "confession" from evidence treatises and sets forth 17 different types of "confession." See *id.*

¶ 40    As to distinguishing confessions from admissions, the State notes this court has recognized "[a] confession must acknowledge all the elements of a crime and be a confession of guilt" (*People v. Floyd*, 103 Ill. 2d 541, 548 (1984)), but an admission is "any statement or conduct from which guilt of the crime may be inferred but from which guilt does not necessarily follow" (internal quotation marks omitted) (*People v. Georgev*, 38 Ill. 2d 165, 175-76 (1967)). See *People v. Harvey*, 2024 IL 129357, ¶ 24 (explaining the defendant, who only admitted one element of the offense, did not "confess" to the police that he committed the offense because he did not make an extrajudicial statement admitting to all the elements of that offense).

¶ 41    However, as the appellate court noted, this court "has held that, under section 114-11 [of the Code of Criminal Procedure of 1963], the word confession must be read to include both inculpatory and exculpatory statements, thereby embracing the then-new constitutional standards in *Miranda* [*v. Arizona*], 384 U.S. 436 [(1966)]." (Internal quotation marks omitted.) 2023 IL App (1st) 220372, ¶ 53 (majority

opinion) (citing *People v. Costa*, 38 Ill. 2d 178, 182-83 (1967)). Section 114-11 of the Code of Criminal Procedure of 1963 (Code) addresses a motion to suppress a confession based on the confession being involuntary. 725 ILCS 5/114-11 (West 2022). The State notes the appellate court recognized this court limited its broader interpretation of "confession" to just section 114-11. 2023 IL App (1st) 220372, ¶ 62.

¶ 42    In interpreting "confession" for purposes of section 114-11, this court explained the drafting committee's introductory comments to article 114 of the Code stated " 'the primary guides in this area are constitutional ones. *** With these guides in mind, the Committee has attempted to provide a uniform and efficient method of ensuring these rights to the accused prior to trial without prejudice to the State.' " *Costa*, 38 Ill. 2d at 182 (quoting 725 ILCS Ann. 5/art. 114, Committee Comments-1963, at 346 (Smith-Hurd 1964)). We noted that, if we were to apply section 114-11 literally without relevant constitutional requirements read into it, serious difficulties would result. *Id.* at 182-83. For example, the word " 'voluntary' " had become a term of art in a constitutional sense, and "the references in section 114-11 to an 'involuntary confession' and to a confession 'not voluntarily made' must be read as embracing the constitutional standards that govern admissibility." *Id.* at 183.

¶ 43    Likewise, we examine the underlying purpose of the statute, the evils sought to be remedied by the act, and the consequences of construing the statute in one manner versus another. The TIRC Act declares its purpose is to establish "an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture." 775 ILCS 40/10 (West 2018). This court has recognized the TIRC Act is remedial in nature and must be broadly interpreted to further its aforementioned purpose. *Fair*, 2024 IL 128373, ¶ 81. While the TIRC Act is specifically concerned with torture and not the voluntariness of statements in general (*id.*), it does seek to provide relief where the State has obtained evidence from a petitioner that was not freely given, like section 114-11.

¶ 44    The State's construction of tortured confession is a very narrow one and inconsistent with the purpose and remedial nature of the act. The TIRC Act is targeted at torture, and providing relief only when the torture results in revealing all elements of the crime and not just inculpatory evidence in general would do a

disservice to the act's purpose. As the appellate court recognized, "a torturer not only seeks to obtain confessions but statements that can be used against a suspect." 2023 IL App (1st) 220372, ¶ 65.

¶ 45    The Commission's definition provides broader relief for acts resulting from torture, including not only incriminating statements but also incriminating vocalizations and gestures. The Commission's definition also encompasses statements the convicted person denies making but the police or prosecutors have alleged the convicted person did make. This significantly broader relief provided by the Commission's definition of tortured confession is consistent with the purpose of the TIRC Act and its remedial nature.

¶ 46    Given the Commission's definition is entitled to deference and its broader language is consistent with the purpose of the TIRC Act and its remedial nature, we agree with the appellate court that the Commission's definition of "tortured confession" is the proper definition.

¶ 47    In this case, petitioner's purported statements to Detective Fidyk fall under the Commission's definition of tortured confession. The statements were incriminating and alleged by both Detective Fidyk and the prosecutor to have been made by petitioner, who was convicted of first degree murder. Moreover, the statements were included in Detective McDermott's police report regarding an interrogation that petitioner claims included torture. The fact petitioner denied making any statements to the police during the interrogation that allegedly included torture does not remove the statement from the definition of "tortured confession." Thus, the appellate court properly reversed the circuit court's termination of the proceedings under the TIRC Act and remanded the cause for an evidentiary hearing.

¶ 48    After finding remand for an evidentiary hearing was warranted, the appellate court, for purposes of remand, rejected "Milan's contention that the potential *Brady* violation is irrelevant to [petitioner]'s torture claim and could not be raised under the [TIRC] Act." *Id.* ¶ 77. The State contends petitioner's claim was not a cognizable claim of torture. Since the appellate court's opinion, this court rendered our decision in *Fair*, 2024 IL 128373. There, we explained that a court analyzing whether a petitioner has shown torture occurred by a preponderance of the evidence must consider the totality of the circumstances, including any alleged additional constitutional violations that would not necessarily qualify as torture if viewed

alone. *Id.* ¶ 88. Thus, we clarify the appellate court's directions for remand. Petitioner's alleged *Brady* violation, which he did raise in his successive postconviction petition, is to be considered as part of the totality of the circumstances in assessing petitioner's claim of torture but is not a freestanding constitutional claim in the proceedings under the TIRC Act.

¶ 49                               B. Motion to Rescind Milan's Appointment

¶ 50        The State also challenges the appellate court's finding Milan labored under an actual conflict of interest. When the facts underlying the appeal are undisputed as in this case, the question of whether an actual conflict of interest exists presents a legal question. *People v. Yost*, 2021 IL 126187, ¶ 35. We review *de novo* a question of law. *Id.* Moreover, even if the facts were in dispute, the parties presented only documentary evidence on the issue. This court has recently reaffirmed the principle that, " 'where the evidence before a trial court consists of depositions, transcripts, or evidence otherwise documentary in nature, a reviewing court is not bound by the trial court's findings and may review the record *de novo*.' " *People v. Morgan*, 2025 IL 130626, ¶ 51 (quoting *Addison Insurance Co. v. Fay*, 232 Ill. 2d 446, 453 (2009)).

¶ 51        The applicable version of section 3-9008(a-10) of the Counties Code (55 ILCS 5/3-9008(a-10) (West 2020)) provides that, "[i]f the court finds that the petitioner has proven by sufficient facts and evidence that the State's Attorney has *an actual conflict of interest* in a specific case, the court may appoint some competent attorney to prosecute or defend the cause or proceeding." (Emphasis added.) The prior version of the statute provided for the appointment of a special prosecutor where "the State's attorney *** is interested in any cause or proceeding, civil or criminal, which it is or may be his duty to prosecute or defend." 55 ILCS 5/3-9008(a) (West 2014). As such, when a petition for a special prosecutor or, as in this case, the rescission of the current special prosecutor and the appointment of a new special prosecutor is brought under section 3-9008(a-10), a new appointment is permissible only where there is an actual conflict of interest. See *In re Appointment of Special State's Attorney*, 2020 IL App (2d) 190845, ¶ 16. Moreover, the language of section 3-9008(a-10) places the burden on the party seeking the new appointment

to present "sufficient facts and evidence" establishing the actual conflict of interest. 55 ILCS 5/3-9008(a-10) (West 2020).

¶ 52    Section 3-9008 does not define "actual conflict of interest." Illinois courts have recognized a state's attorney may have an interest in an action as (1) a private individual or (2) an actual party to the action. *In re Appointment of Special State's Attorney*, 2020 IL App (2d) 190845, ¶ 17. Furthermore, this court has explained that, to establish an actual conflict of interest, the movant must identify a specific deficiency in counsel's strategy, tactics, or decision-making that is attributable to the alleged conflict. *Yost*, 2021 IL 126187, ¶ 38. "Speculative allegations and conclusory statements are insufficient to establish an actual conflict of interest." *Id.* As such, an appearance of impropriety alone is insufficient to remove a prosecutor or special prosecutor under the applicable version of section 3-9008(a-10).

¶ 53    We emphasize this case involves a former prosecutor in the role of a special prosecutor, not a judge. We disagree with the appellate court's characterizing Milan's current and former roles as "quasi-judicial" and treating them as judicial roles. The cases the appellate court relied upon do not support that position. In *Imbler v. Pachtman*, 424 U.S. 409, 422-23 (1976), the United States Supreme Court addressed prosecutorial immunity and noted common-law prosecutorial immunity was based upon the same considerations that underlie the common-law immunities for judges and grand jurors when acting within the scope of their duties. In a footnote, the Court explained prosecutors, judges, and grand juries all exercise a discretionary judgment based on evidence presented to them, which resulted in both grand jurors and prosecutors being *referred* to as " 'quasi-judicial' " officers. *Id.* at 423 n.20. In *People ex rel. Schreiner v. Courtney*, 380 Ill. 171, 179 (1942), this court also addressed prosecutorial immunity when referring to the state's attorney as a quasi-judicial officer. However, the fact that prosecutorial immunity is based upon the same considerations as judicial immunity does not mean a prosecutor should be considered a judge for purposes of determining conflicts of interest. Moreover, in *Williams v. Pennsylvania*, 579 U.S. 1 (2016), the Court addressed *judicial* bias. As such, the Court's finding in *Williams* that "[u]nder the Due Process Clause there is an impermissible *risk of actual bias* when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case" is inapplicable to this case and other cases involving prosecutors.

(Emphasis added.) *Id.* at 8. Accordingly, the aforementioned cases fail to establish both that Milan was acting in a judicial role and a due process violation.

¶ 54        As for a prosecutor, the United States Supreme Court has explained a prosecutor's interest in a criminal prosecution " 'is not that it shall win a case, but that justice shall be done.' " *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). Yet, once the defendant's conviction and sentence are reviewed and affirmed on direct appeal, the State has a legitimate interest in preserving the finality of that affirmance. *People v. Owens*, 129 Ill. 2d 303, 316 (1989). As provided under section 50(b) of the TIRC Act (775 ILCS 40/50(b) (West 2018)), the State is represented at the judicial review hearing by the state's attorney or the state's attorney's designee. Nothing in the TIRC Act suggests that the State's interest in the judicial review proceedings is different from its interest in other collateral proceedings.

¶ 55        Here, when petitioner was arrested, interrogated, and tried, Milan was supervisor of the Cook County State's Attorney's Office felony review unit. Milan was later first assistant state's attorney until 2008. The appellate court found this put him in the improper position of judging himself and his subordinates. 2023 IL App (1st) 220372, ¶ 94. However, as noted by the State, prosecutors routinely represent the State in other collateral proceedings and address allegations of prosecutorial misconduct. In such instances, the prosecutor and the State are both interested in the preservation of the conviction and sentence. Thus, Milan's mere position as supervisor at the time petitioner was arrested, charged, and prosecuted alone is insufficient to establish a conflict of interest. In addressing petitioner's second motion to rescind, the circuit court found petitioner had not shown Milan participated directly in or was at all involved in petitioner's case beyond his responsibility as the supervisor. We agree with the circuit court's suggestion that, for there even to be a conflict of interest, petitioner had to present evidence Milan was actually involved in his prosecution.

¶ 56        Likewise, the mere fact Milan was in a supervisory role at the Cook County State's Attorney's Office when Detective McDermott was hired by that agency as an investigator is insufficient to establish an actual conflict of interest. Petitioner's brief does not provide a citation of the record in support of his assertion Milan was the person who hired and supervised Detective McDermott when he worked for the

state's attorney's office. While the Cook County State's Attorney's Office declined to represent the State in petitioner's torture case due to its former employment of Detective McDermott, section 3-9008(a-15) of the Counties Code allows a state's attorney to file a petition to recuse the state's attorney from a proceeding for any reason the state's attorney deems appropriate. See 55 ILCS 5/3-9008(a-15) (West 2020). Thus, the state's attorney's office may have declined to represent the State in petitioner's case due to an appearance of impropriety. On the record before us, this court does not know if the Cook County state's attorney had an actual conflict of interest or anyone else in the office had an actual conflict of interest based on Detective McDermott's employment. Again, the mere fact the Cook County State's Attorney's Office declined to represent the State in these proceedings does not establish Milan had an actual conflict of interest.

¶ 57    Petitioner also asserts Milan has a conflict of interest under Rule 1.7 of the Illinois Rules of Professional Conduct of 2010 (Ill. R. Pro. Conduct (2010) R. 1.7(a) (eff. Jan. 1, 2010)), which prohibits a lawyer from representing "a client if the representation involves a concurrent conflict of interest." Under the rule, a concurrent conflict of interest exists in two circumstances, one of which is when "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." Ill. R. Pro. Conduct (2010) R. 1.7(a)(2) (eff. Jan. 1, 2010). Petitioner argued Milan's personal interest in defending the probity of his own past conduct "may" cause him to deviate from the duty to impartially do justice to both the State's and petitioner's interests. The appellate court found petitioner's alleged conflict did "not fit squarely with the type of conflicts recognized in the rule" but did find the concepts expressed in the rule support rescinding Milan's appointment. 2023 IL App (1st) 220372, ¶ 106. However, petitioner again relies solely on Milan's supervisory role and not on actual evidence he was involved in petitioner's prosecution. Additionally, before this court, petitioner does not raise a conflict of interest argument based on Rule 5.1(b), and he has never raised in any court an argument based on Rule 5.1(c). Our declining to address Rule 5.1 is not an implicit agreement with the merits of the dissent's findings. The matter of Milan's actual conflict of interest has gone through the appellate process and been reviewed in accordance with this court's rules.

¶ 58    Here, petitioner has failed to identify any evidence in the record showing Milan's direct involvement in petitioner's arrest, interrogation, and prosecution, as well as the hiring and supervising of Detective McDermott. As such, petitioner has failed to meet his burden of showing an actual conflict of interest, and the appellate court erred in reversing the circuit court's denial of petitioner's motions to rescind Milan's appointment.

¶ 59                                    III. CONCLUSION

¶ 60    For the foregoing reasons, we hold the circuit court's dismissal of petitioner's claim of torture under the TIRC Act was erroneous but that its denials of petitioner's motions to rescind Milan's appointment were proper. Therefore, we affirm in part the appellate court's judgment reversing the circuit court's dismissal of the proceedings under the TIRC Act and remanding the cause for further proceedings and reverse in part its judgment reversing the circuit court's denial of petitioner's motions to rescind.

¶ 61    Appellate court judgment affirmed in part and reversed in part.

¶ 62    Circuit court judgment affirmed in part and reversed in part.

¶ 63    Cause remanded with directions.

¶ 64    JUSTICE NEVILLE, concurring in part and dissenting in part:

¶ 65    In April 2000, Chicago police detectives David Fidyk and Michael McDermott went to Seattle, Washington, arrested Abdul Muhammad, brought him back to Chicago, and interrogated him at Area 2. An assistant state's attorney working under the supervision of Robert Milan charged Muhammad with first degree murder based on the work of the detectives. Muhammad was convicted on November 15, 2001, and sentenced on December 12, 2001, to 50 years in prison.

¶ 66    In July 2014, Muhammad filed a claim with the Torture Inquiry and Relief Commission (Commission) alleging that police at Area 2 tortured him. The Commission found credible evidence that police tortured Muhammad.

¶ 67    The Illinois Rules of Professional Conduct prescribe the duties and responsibilities of supervising attorneys, like Milan, for the conduct of their subordinates. Rule 5.1 provides that "[a] lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if *** the lawyer *** has direct supervisory authority over the other lawyer, and knows of the conduct *** but fails to take reasonable remedial action." Ill. R. Pro. Conduct (2010) R. 5.1(c) (eff. Jan. 1, 2010). Milan's potential supervisory liability creates an actual conflict of interest that should bar him from acting as special prosecutor in the proceedings concerning the allegations that police tortured Muhammad. See 55 ILCS 3-9008(a-10) (West 2018) ("If the court finds that the petitioner has proven *** that the State's Attorney has an actual conflict of interest in a specific case, the court may appoint some competent attorney to prosecute or defend the cause ***."). In spite of the Commission's finding of credible evidence of police torture at Area 2, during the time Milan supervised felony review attorneys at Area 2, the majority permits Milan to retain his position as special prosecutor. Accordingly, because this case involves credible evidence of police torture allegedly committed by Milan's subordinates (assistant state's attorneys and their agents, the Chicago police) and because the majority reverses the part of the appellate court's judgment remanding the case for appointment of a different special prosecutor, I respectfully dissent.

¶ 68                                    I. BACKGROUND

¶ 69    In March 1999, an assistant state's attorney in the Cook County State's Attorney's Office (CCSAO) sent to Milan, her supervisor, a memorandum about an oral statement she obtained from Duel Thomas, a suspect in a murder unrelated to the charges against Muhammad. The assistant state's attorney wrote that, when she met Thomas, she saw he

> "had a lump on his forehead with a small abrasion on it. The defendant's jaw also appeared to be slightly swollen and he had a small amount of blood on the front of his shirt. The injuries and blood appeared to be fresh. I asked the defendant what had happened and he refused to speak to me. I left the room and returned a short time later and again asked the defendant what had happened to him at which time he told me that two men came into the room and kicked him as he was lying on the floor sleeping."

The assistant state's attorney further reported that the detectives working on the case admitted that Thomas had no such injuries before he came to the police station and they claimed they did not know how he sustained the injuries. According to the memorandum, Thomas confessed to acting as a lookout for the murder under investigation.

¶ 70    To appreciate the significance of the memorandum, we must read it in its context. Beginning in 1990, John Conroy wrote for the *Chicago Reader* a series of articles, starting with "House of Screams," concerning the torture committed by police at Area 2. John Conroy, *House of Screams*, Chi. Reader (Jan. 26, 1990), https://chicagoreader.com/news/house-of-screams/ [https://perma.cc/9BR7-FMEJ].

¶ 71    Litigation in the 1990s aired evidence of the many crimes committed by police at Area 2 and condoned by prosecutors working there. See *Wiggins v. Burge*, 173 F.R.D. 226, 229 (N.D. Ill. 1997) (public interest in documents concerning police torture outweighed privacy interests of the officers); *People v. Banks*, 192 Ill. App. 3d 986, 990-93 (1989); Elliott Riebman, *How and Why a Code of Silence Between State's Attorneys and Police Officers Resulted in Unprosecuted Torture*, 9 DePaul J. for Soc. Just. 1 (2016). By late 2000, this court had published several opinions concerning "the pervasive pattern of criminal conduct by police officers at Area 2." *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 63 (citing *People v. Patterson*, 192 Ill. 2d 93, 139-45 (2000), *People v. King*, 192 Ill. 2d 189, 193-99 (2000), and *People v. Cannon*, 293 Ill. App. 3d 634, 640 (1997)).

¶ 72    The record in this case does not show any action by Milan in response to the memorandum: no change in policies regarding access to interview rooms, no change regarding treatment of suspects. The circuit court found Thomas guilty of first degree murder. The appellate court made no reference to the evidence of torture in its decision affirming the conviction. See *People v. Thomas*, 354 Ill. App. 3d 868 (2004).

¶ 73    In June 2000, a year after Milan received the memorandum regarding Thomas, an attorney working under Milan's supervision decided to ask a grand jury to indict Muhammad on a charge of first degree murder.

¶ 74 In 2018, the Commission found credible evidence that police tortured Muhammad, and it referred the case to the Cook County circuit court for a determination of whether torture occurred and what relief, if any, the court should provide to Muhammad. See 775 ILCS 40/50 (West 2018) (when the Commission refers the case to the circuit court, "if the court finds in favor of the petitioner, it shall enter an appropriate order with respect to the judgment or sentence in the former proceedings and such supplementary orders as to rearraignment, retrial, custody, bail or discharge, or for such relief as may be granted under a petition for a certificate of innocence, as may be necessary and proper"). The circuit court appointed Milan to act as special prosecutor handling Muhammad's claims of torture. The circuit court denied Muhammad's motions to rescind the appointment of Milan. The appellate court reversed the judgment of the circuit court and remanded for the appointment of a different special prosecutor.

¶ 75                                    II. ANALYSIS

¶ 76 The majority accepts the State's argument that Milan's role as special prosecutor created no actual conflict of interest and therefore the circuit court correctly denied Muhammad's motion to rescind the appointment of Milan. To show that Milan has an actual conflict of interest, I will (1) examine the purposes of the Illinois Torture Inquiry and Relief Commission Act (TIRC Act) (775 ILCS 40/1 *et seq.* (West 2018)), (2) discuss the duties of prosecutors, and (3) explain that Milan faces a conflict of interest because of a prospect of financial liability if the circuit court finds that Muhammad suffered torture at Area 2. Finally, I will briefly address the majority's finding that Muhammad has not presented sufficient evidence to prove Milan's conflict of interest and the suggestion that Muhammad forfeited consideration of the effect of Rule 5.1 of the Illinois Rules of Professional Conduct of 2010.

¶ 77                              A. Purpose of the TIRC Act

¶ 78 The General Assembly stated that the TIRC Act "establishes an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture." *Id.* § 10. Senator Kwame Raoul, Senate sponsor of the bill that became the TIRC Act, explained:

"[T]his is about people who were tortured in police departments utilizing methods such as electrodes to testicles, suffocating with tops of—of typewriter—typewriter covers. And there are people who may currently be incarcerated who may not be—need to be there. And there are people who may have served time who may want to clear their name. *** [T]he majority of good serving police officers *** would thereby have closure on this. But closure will not be achieved until *** each and every one of their cases are heard." 96th Ill. Gen. Assem., Senate Proceedings, March 25, 2009, at 27 (statements of Senator Raoul).

¶ 79      The House sponsor, Representative Arthur Turner, said,

"The purpose of this would be, basically, to look at the cases where torture has been alleged to see if, in fact, the allegation is substantiated, if, in fact, there was torture. Then their cases could be reopened and they would then be able to proceed to try to get some legal redress ***." 86th Ill. Gen. Assem., House Proceedings, May 13, 2009, at 15 (statements of Representative Turner).

¶ 80      The sponsors' comments show that in part the legislature adopted the TIRC Act to restore public confidence in the criminal justice system by addressing the wrongful convictions that have long plagued Chicago. See Heather Cherone, *4 Months Into the Year, Chicago Set to Exhaust $82M Annual Budget for Police Misconduct Settlements*, WTTW News (Apr. 14, 2025), https://news.wttw.com/ 2025/04/14/chicago-set-exhaust-annual-budget-police-misconduct-settlements [https://perma.cc/ERQ3-VGJY] ("between January 2019 and June 2024, Chicago taxpayers spent a total of $200 million to resolve lawsuits brought by more than three dozen people who were wrongfully convicted based on evidence [produced] by the Chicago Police Department"); *How Chicago Racked Up a $662 Million Police Misconduct Bill*, CBS News (Mar. 21, 2016), http://www.cbsnews.com/ news/how-chicago-racked-up-a-662-million-police-misconduct-bill/ [https:// perma.cc/BZ3T-EXML] (between 2004 and 2016, the City of Chicago paid over $600 million to the many victims of police misconduct). The "wrongful convictions undermine the faith, trust and confidence the public has in the criminal justice system." Ashley H. Wisneski, *"That's Just Not Right": Monetary Compensation for the Wrongly Convicted in Massachusetts*, 88 Mass. L. Rev. 138, 150 (2004); see John T. Rago, *A Fine Line Between Chaos & Creation: Lessons on Innocence*

*Reform From the Pennsylvania Eight*, 12 Widener L. Rev. 359, 360 (2006) ("Inescapably, both at once and continuing over time, wrongful convictions diminish public confidence in the rule of law \*\*\*.").

¶ 81 Wrongful convictions frequently result from misconduct of police and prosecutors. Russell Covey, *Police Misconduct as a Cause of Wrongful Convictions*, 90 Wash. U.L. Rev. 1133, 1147 (2013); Alisha L. McKay, Comment, *Let the Master Answer: Why the Doctrine of Respondeat Superior Should Be Used to Address Egregious Prosecutorial Misconduct Resulting in Wrongful Convictions*, 2012 Wis. L. Rev. 1215, 1222 (2012) ("Studies confirm that prosecutorial misconduct is a significant contributor to the causes of wrongful convictions.").

¶ 82 The TIRC Act shows the interest of the people in overturning wrongful convictions, convictions that resulted from torture, as a way of restoring trust in the justice system. 775 ILCS 40/10 (West 2018).

¶ 83 Permitting the supervising attorneys from Area 2 from the 1980s, 1990s, or the 2000s to act as special prosecutors investigating the alleged misconduct of the police and attorneys who worked under their supervision will further undermine public confidence and trust in the criminal justice system. Caleb J. Robertson, Comment, *Restoring Public Confidence in the Criminal Justice System: Policing Prosecutions When Prosecutors Prosecute Police*, 67 Emory L.J. 853, 865 (2018) ("Local district attorneys should be presumptively barred from prosecutions of police officers in their locality because these cases give rise to an apparent conflict that threatens the appearance of justice.").

¶ 84                                    B. Duties of Prosecutors

¶ 85 The majority acknowledges that special prosecutors have a duty to see " ' "that justice shall be done." ' " *Supra* ¶ 54 (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999), quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). But the majority overlooks the prosecutor's "common-law duty to investigate suspected illegal activity[, which arises mostly under] circumstances where other law enforcement agencies inadequately deal with such investigation," especially " 'where law enforcement officials are themselves involved.' " *People v. Ringland*,

2017 IL 119484, ¶ 25 (quoting ABA Standards for Criminal Justice, Standard 3-3.1(a), Commentary (3d ed. 1993)).

¶ 86 Prosecutors must avoid "partiality *** which may tend to deprive the defendant of the fair trial to which he or she is entitled." *Rogowicz v. O'Connell*, 786 A.2d 841, 844 (N.H. 2001) (quoting 63C Am. Jur. 2d *Prosecuting Attorneys* § 23 (1997)). " '[T]he appointment of a partisan special prosecutor [is] not in the interest of the fair and impartial trial guaranteed by the Constitution.' " *State v. Jensen*, 160 N.W. 832, 833 (Iowa 1917) (quoting *Flege v. State*, 142 N.W. 276, 278 (Neb. 1913)). Justice Blackmun said, "the practice—federal or state—of appointing an interested party's counsel to prosecute *** is a violation of due process. This constitutional concept, in my view, requires a disinterested prosecutor with the unique responsibility to serve the public." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 814-15 (1987) (Blackmun, J., concurring).

¶ 87 By approving the appointment of a partisan special prosecutor, the majority ignores the interests of the People of the State of Illinois—Milan's ostensible client—in a full and fair hearing of the evidence of torture when the Commission has found credible evidence that police used torture to obtain a wrongful conviction.

¶ 88 C. Conflict of Interest

¶ 89 Milan does not share the interests of the People, the legislature, and the Commission in resolving the factual claims of torture. If the circuit court finds that the torture of Muhammad provides grounds for vacating his conviction, Muhammad will have a viable cause of action against Milan for damages, under Title 42, section 1983, of the United States Code (42 U.S.C. § 1983 (2018)), for violating rule 5.1(c) of the Illinois Rules of Professional Conduct. Ill. R. Pro. Conduct (2010) R. 5.1(c) (eff. Jan. 1, 2010).

¶ 90 Rule 5.1(c) provides:

"A lawyer shall be responsible for another lawyer's violation of the Rules of Professional Conduct if:

(1) the lawyer *** ratifies the conduct involved; or

(2) the lawyer \*\*\* has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action." *Id.*

¶ 91     A scholar explained the grounds for using Rule 5.1(c) to establish a supervising attorney's liability for the acts of those he supervised:

"No single instance of prosecutorial misconduct—revealed perhaps by the reversal of a criminal case or the exoneration of an innocent defendant—can ever be fully explained by the deeds of a lone actor without looking at who establishes enforcement priorities, who sets office policies, who provides incentives to subordinates, and who does the training." R. Michael Cassidy, *Unleashing Rule 5.1 to Combat Prosecutorial Misconduct*, 102 Or. L. Rev. 269, 270 (2024).

"[W]here [a prosecutor's] misconduct is ordered or ratified under Rule 5.1(c), or could have been detected and avoided by more adequate supervision under Rule 5.1(b), multiple actors bear responsibility." *Id.* at 290.

¶ 92                 1. Cases Discussing Liability for Supervisors of Prosecutors

¶ 93     Litigants have sought to hold supervisors of prosecutors personally liable in a number of cases, and several courts have allowed the claims to proceed. In *Diaz-Morales v. Rubio-Paredes*, 170 F. Supp. 3d 276 (D.P.R. 2016), after a court vacated Diaz-Morales's murder conviction, Diaz-Morales sued the prosecuting attorney and the prosecutor's supervisor for malicious prosecution. The district court denied the supervisor's motion to dismiss the claims against him. The district court explained:

"supervisory liability may attach \*\*\* if a responsible official supervises, trains, or hires a subordinate with deliberate indifference toward the possibility that deficient performance of the task eventually may contribute to a civil rights deprivation. [Citation.] [T]he plaintiff in a Section 1983 action must show \*\*\* conduct that amounts to condonation or tacit authorization, . . . between the actor and the underlying violation." (Internal quotation marks omitted.) *Id.* at 286.

¶ 94　　　　In *Murphy v. Middlesex County*, 361 F. Supp. 3d 376, 387 (D.N.J. 2019), the district court found the plaintiff adequately stated a cause of action against the county prosecutor on a theory of supervisory liability, holding that "defendants may be sued as policy makers if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, custom, or practice which directly caused [the] constitutional harm." (Internal quotation marks omitted.) The plaintiff could establish the supervising attorney's liability by showing he "had knowledge of and acquiesced in his subordinates' violations" of suspects' rights. *Id.*

¶ 95　　　　Similarly, a federal court held that "a supervisor may be personally liable under § 1983 if he or she *** had knowledge of and acquiesced in his subordinates' violations." (Internal quotation marks omitted.) *Festa v. Jordan*, 803 F. Supp. 2d 319, 325 (M.D. Pa. 2011). "Acquiescence is found [w]here a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so ***." (Internal quotation marks omitted.) *Id.*; see *Wooten v. Roach*, 431 F. Supp. 3d 875, 888-91 (E.D. Tex. 2019) (plaintiff stated section 1983 claim against the district attorney for supervisory liability).

¶ 96　　　　*Diaz-Morales*, *Murphy*, *Wooten*, and *Festa* show the importance of the March 1999 memorandum from an assistant state's attorney to Milan (*supra* ¶ 20). The memorandum supports an inference that Milan "had knowledge of and acquiesced in his subordinates' violations" of the rights of suspects. See *Murphy*, 361 F. Supp. 3d at 387. Following *Diaz-Morales*, *Murphy*, *Wooten*, and *Festa* and adopting the reasoning of the Cassidy law review article, I find that Milan's acquiescence in the police and prosecutors' practices may subject him to supervisory liability. Milan's interest in avoiding litigation directed at his potential supervisory liability directly conflicts with the interest of his client, the public, (1) in avoiding more multimillion dollar judgments against the City of Chicago for misconduct of the police and (2) in uncovering and ending the use of torture to obtain convictions in order to restore faith in the justice system.

¶ 97　　　　　　　　　　　　　　　　　2. *Wilson*

¶ 98    *Wilson v. Administrator of the Estate of Burge*, 667 F. Supp. 3d 785 (N.D. Ill. 2023), explains Milan's financial interest in the outcome of proceedings on Muhammad's torture allegations. Wilson sued Burge's estate and several detectives for damages Wilson suffered due to police officers' fabrication of evidence against Wilson. *Id.* at 808.

¶ 99    Wilson added as a codefendant Lawrence Hyman, "supervisor of the Felony Review Unit of the *** CCSAO" (*id.* at 810), alleging that he "encourag[ed], condon[ed], and permitt[ed]" "torture and other coercive techniques" (*id.* at 829). In the course of denying Hyman's motion to dismiss the complaint, the district court held that a section 1983 cause of action for violation of due process by coercion of a false confession accrues when "the conviction or sentence has been invalidated." *Id.* at 817.

¶ 100   Thus, if the circuit court finds that the use of a tortured confession invalidates Muhammad's conviction, Muhammad could sue Milan for civil penalties on the same theory advanced in *Wilson*: Milan, as "supervisor of the Felony Review Unit of the CCSAO," bears responsibility for "encouraging, condoning, and permitting" use by police and assistant state's attorneys of "torture and other coercive techniques" to obtain convictions, including Muhammad's conviction.

¶ 101   Under *Wilson*, the section 1983 action does not accrue if the circuit court finds (as Milan asked the circuit court to find) that the conviction and sentence remain valid. *Id*. Milan's financial interest in filing a motion to terminate the case referred by the Commission conflicts with the State's interest in rectifying injustices inflicted by the State by wrongful convictions obtained at least in part through torture. See *Maryland Casualty Co. v. Peppers*, 64 Ill. 2d 187, 197-98 (1976) (although insured and insurer had a shared interest in a finding that the insured did not cause the damages at issue, the insurer's interest in a possible finding that the insured intentionally caused the damage—which would exempt the insurer from needing to pay for the damages—created a conflict of interest that precluded the insurer's attorney from representing the insured). Milan's conflict should disqualify him from proceeding as special prosecutor in this case.

¶ 102                    D. Evidence in the Record

- 28 -

¶ 103    The majority reverses the appellate court's judgment requiring the appointment of a new special prosecutor because "petitioner has failed to identify any evidence in the record" showing Milan's interest in the case. *Supra* ¶ 58. The majority relies on section 3-9008(a-10) of the Counties Code, which "places the burden on the party seeking the new appointment to present 'sufficient facts and evidence' establishing the actual conflict of interest." *Supra* ¶ 51 (quoting 55 ILCS 5/3-9008(a-10) (West 2018)). The requirement of sufficient evidence does not apply to this case because the trial court has not held a hearing on the allegations that Milan faced an actual conflict of interest.

¶ 104    The Counties Code provides:

"an interested person in a cause *** may file a petition alleging that the State's Attorney has an actual conflict of interest in the cause ***. The court shall consider the petition, any documents filed in response, and if necessary, grant a hearing to determine whether the State's Attorney has an actual conflict of interest in the cause or proceeding. If the court finds that the petitioner has proven by sufficient facts and evidence that the State's Attorney has an actual conflict of interest in a specific case, the court may appoint some competent attorney to prosecute or defend the cause or proceeding." 55 ILCS 5/3-9008(a-10) (West 2018).

¶ 105    The procedure under the Counties Code on a petition for a determination of whether the prosecutor faces a conflict of interest bears some similarity to proceedings on postconviction petitions. Compare 725 ILCS 5/122-2 (West 2018) (postconviction petition "shall have attached thereto affidavits, records, or other evidence supporting its allegations") and *id.* § 122-6 ("The court may receive proof by affidavits, depositions, oral testimony, or other evidence. In its discretion the court may order the petitioner brought before the court for the hearing."), with 55 ILCS 5/3-9008(a-10) (West 2018) ("The court shall consider the petition, any documents filed in response, and if necessary, grant a hearing to determine whether the State's Attorney has an actual conflict of interest ***."). The trial court must first determine whether the petition sufficiently alleges a basis for finding a conflict of interest, and if the petition includes sufficient allegations, the trial court must hold an evidentiary hearing to determine whether evidence supports a finding of an actual conflict. See *People v. Smith*, 44 Ill. 2d 82, 85 (1969) (" 'The function of the

- 29 -

pleadings in a proceeding under the [Post-Conviction Hearing Act] is to determine whether the petitioner is entitled to a hearing." (quoting *People v. Airmers*, 34 Ill. 2d 222, 226 (1966))); *People v. Coleman*, 183 Ill. 2d 366, 381 (1998) ("at a dismissal hearing *** all well-pleaded facts are to be taken as true," and "a hearing is required whenever the petitioner makes a substantial showing of a violation of constitutional rights")

¶ 106    Because the trial court here did not hold the evidentiary hearing permitted by subsection (a-10), the court is presented with only the issue of whether Muhammad has sufficiently alleged grounds for rescinding Milan's appointment. Muhammad's allegations support a finding that Milan has a personal, financial interest in avoiding possible supervisory liability for the acts of attorneys he supervised and the police who supplied the evidence on which those attorneys based their decisions of whether to prosecute suspects. If the majority needs more evidence to determine whether Milan faces an actual conflict of interest, the court should remand the case to the trial court for discovery and an evidentiary hearing in accord with subsection (a-10). See 55 ILCS 5/3-9008(a-10) (West 2018) (the court, "if necessary, [shall] grant a hearing to determine whether the State's Attorney has an actual conflict of interest"); *People v. Fair*, 193 Ill. 2d 256, 264-65 (2000) (in postconviction proceedings, "the circuit court should allow discovery only after the moving party demonstrates good cause for a discovery request" (internal quotation marks omitted)).

¶ 107    The majority permits Milan to prosecute this case because Muhammad "does not raise a conflict of interest argument based on Rule 5.1(b), and he has never raised in any court an argument based on Rule 5.1(c)." *Supra* ¶ 57.

¶ 108    Muhammad does not bear sole responsibility for ensuring conflict-free representation for the People of the State of Illinois. The courts have a "duty to 'maintain public confidence in the legal profession and assist[ ] in protecting the integrity of the judicial proceeding.' [Citation.] Disqualifying conflicted counsel is 'a drastic measure' toward this end, but we must take this step when necessary to 'protect[ ] the attorney-client relationship.' [Citation.]" *Doe v. Nielsen*, 883 F.3d 716, 718 (7th Cir. 2018) (quoting *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982)).

¶ 109     The reasoning of *Doe* applies here. Doe, seeking to immigrate, applied for permanent resident status under a program that required applicants to demonstrate that they had invested capital in a new enterprise in the United States. *Id.* at 717. Doe hired the Kameli Law Group (KLG) to represent him in immigration proceedings. United States Citizenship and Immigration Services (USCIS) rejected Doe's claim, noting that Elgin, the new enterprise in which Doe invested, had not actually progressed as an enterprise despite the passage of several years from its inception. *Id.*

¶ 110     During the pendency of the appeal, the Securities and Exchange Commission filed a civil action against Taher Kameli of KLG, alleging that Kameli defrauded immigrant investors, including the investors in Elgin. *Id.* at 718. Despite Doe's acceptance of conflicted counsel (*id.* at 719 n.1), the court disqualified KLG (*id.* at 719-20). The court explained:

         "First, a conflict of interest arises when an attorney has an incentive to reject lines of inquiry or argument that might help his client's case. *** [KLG] and Doe might share an interest in proving that the Elgin investment was not a sham, but that is where their alliance begins and ends. [KLG] would not advise Doe to *** alleg[e] fraud and seek[ ] reconsideration of the USCIS's decision. ***

         Second, a lawyer owes his client a duty of 'undivided fidelity.' [Citation.] Having a duty to someone else obviously 'interfere[s] with the undivided loyalty [that] the attorney owes his client' and ultimately 'detract[s] from achieving the most advantageous position for his client.' [Citation.] *** [KLG's] duty of loyalty to Doe would require [it] to complete the Elgin project because that would best position him to obtain lawful permanent residence. [KLG's] obligations to *** other investors, on the other hand, require [it] to invest in their respective enterprises." *Id.* at 719 (quoting *Pelham v. Griesheimer*, 92 Ill. 2d 13, 22 (1982)).

¶ 111     Regardless of the interest of the People of the State of Illinois, Milan will have a personal financial incentive not to pursue evidence that police tortured Muhammad. Milan will not adequately represent the People of the State of Illinois if the best strategy for the People, in their efforts to restore confidence in the criminal justice system, includes a finding of torture and entry of an order for "rearraignment, retrial, custody, bail or discharge, or for such relief as may be

granted under a petition for a certificate of innocence, as may be necessary and proper." 775 ILCS 40/50(a) (West 2018).

¶ 112                                    III. CONCLUSION

¶ 113      Therefore, I concur in the majority's opinion insofar as it affirms the appellate court's reversal of the dismissal of Muhammad's torture claim. But I respectfully dissent from the majority's opinion insofar as it reverses the appellate court's decision to rescind Milan's appointment as special prosecutor, because the majority's decision undermines the TIRC Act, the legislature's attempt to encourage investigation into torture claims and ensure due process in the proceedings on those claims to help restore public confidence and trust in our justice system. Finally, I would affirm the appellate court and remand the case to the circuit court for the appointment of a different special prosecutor.

¶ 114      JUSTICE O'BRIEN joins in this partial concurrence and partial dissent.