2025 IL App (1st) 232338

FIRST DISTRICT
SECOND DIVISION
July 29, 2025

No. 1-23-2338

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 88 CR 02309 (02) |
| | ) | |
| KEVIN MURRAY, | ) | Honorable |
| | ) | David M. Carlson, |
| Defendant-Appellant. | ) | Judge of the Twelfth Judicial |
| | ) | District, Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Van Tine and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1　After several rounds of custodial interrogation by Chicago police detectives Kriston Kato and John Summerville, petitioner Kevin Murray confessed that he was the getaway driver in the 1987 double murder of Brian Fowler and DeJuan Buck. Petitioner immediately alleged that the detectives beat him and physically coerced his confession, first in bond court the very next day, and then again in his pretrial, trial, and appellate proceedings. On the strength of his confession alone, he was convicted on a theory of accountability and sentenced to life in prison.

¶ 2　In due course, petitioner filed a claim under the Illinois Torture Inquiry and Relief Commission Act (TIRC Act). See 775 ILCS 40/1 *et seq.* (West 2012). The Illinois Torture Inquiry and Relief Commission (TIRC) found sufficient evidence of torture to warrant judicial review and referred the claim to the circuit court. In a "combined petition" under the TIRC Act

and the Post-Conviction Hearing Act, petitioner re-alleged his claim of torture and several constitutional violations. Given a conflict within the Cook County judiciary, the Illinois Supreme Court assigned an out-of-circuit judge from Will County to hear this combined petition.

¶ 3       The State moved to dismiss the TIRC claim, arguing that the TIRC Act violates constitutional, justiciability, and administrative-law principles. The circuit court denied that motion, but not without expounding at some length, in its oral ruling, on why the TIRC Act is a "terrible law." Among the court's litany of complaints was the statute's supposed lack of clarity about the parameters of the "hearing" to be conducted after a TIRC referral. The circuit court thus concluded that it had unfettered or "sole" discretion in this matter.

¶ 4       So after denying the State's motion to dismiss, the circuit court proceeded, on its own motion, to dismiss the TIRC claim for lack of evidentiary support. The court based that ruling on its own review of "the petitions presented by TIRC and the findings thereof." That was enough of an evidentiary hearing for a TIRC claim, the court reasoned, even if the postconviction claims, having advanced to the third stage, required an evidentiary hearing in the usual sense.

¶ 5       The court made the requisite findings for appeal under Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) and stayed the third-stage proceedings on the postconviction claims. We reverse the denial of petitioner's TIRC claim and remand for an evidentiary hearing.

¶ 6                                    BACKGROUND

¶ 7                                         I

¶ 8       Fowler and Buck were gunned down on the west side of Chicago in November 1987. The ballistics evidence indicated two shooters wielding two different automatic, machine-gun style

weapons. The murders were ordered by Sam McKay, the leader of the Black Souls gang, as a hit on a crew of rival drug dealers. Petitioner, we are told, was a member of the Black Souls, though he has often denied any gang affiliation or any relationship with McKay, beyond knowing him by his formidable west-side reputation.

¶ 9    A couple months after the murders, codefendant and Black Souls gang member Tyrone Washington emerged as a suspect. On January 18, 1988, Washington was taken into custody and interrogated at the Area 4 Violent Crimes Unit by Kato and Summerville. When all was said and done, Washington confessed that he shot one of the victims. And along the way, he implicated petitioner in the shooting—as the getaway driver.

¶ 10    With this new development, Kato and Summerville turned their attention to petitioner, whose own interrogation at Area 4 overlapped with Washington's. To make another long story short, at least for now, petitioner eventually signed a court-reported statement.

¶ 11    Petitioner said, in sum, that McKay called a meeting to discuss the problem of "people selling drugs around his territory." Petitioner attended, as did Washington and two others, "Jet" and "Paris." The plan, put simply, was to find "Smitty and his boys" and kill them. That plan was promptly executed. Petitioner drove; Washington and Jet armed themselves with Uzis. After driving for a while, they spotted some of Smitty's crew. Washington and Jet got out of the car. A barrage of gunshots rang out. Petitioner picked up Washington and Jet and drove away.

¶ 12    For a charge based on accountability, petitioner's confession covered all the bases. And it lined up neatly with Washington's confession: each one implicated petitioner as the driver and Washington as one of the shooters. The State thus charged them both. Petitioner and Washington

moved to suppress their respective confessions before trial, alleging (among other things) that the confessions were beaten out of them by Summerville and Kato. To take the death penalty off the table, Washington pleaded guilty after his motion was denied; he was sentenced to life in prison.

¶ 13    Petitioner went to trial. Washington did not testify, and thus his custodial statement was not introduced. The State had no other eyewitnesses. No physical evidence linked petitioner to the murders. For all practical purposes, petitioner's confession *was* the State's case.

¶ 14    For reasons that will emerge, the State's theory of the case bears emphasis: petitioner was the "wheel man," the "driver," not one of the "trigger men." The jury was accordingly instructed on the law of accountability. Thirty-two years ago, we upheld the verdicts against petitioner's sufficiency challenge and claims of trial error. *People v. Murray*, 254 Ill. App. 3d 538 (1993).

¶ 15                                             II

¶ 16    In the years that passed between his direct appeal and his TIRC filing, petitioner did not pursue any postconviction proceedings. But the torture allegations in the TIRC filing were not new. They first surfaced at petitioner's bond hearing; they were central to his suppression motion and to his defense at trial; and they lingered on direct appeal, forming the basis of an alleged trial error. An overview of petitioner's generally consistent allegations throughout these proceedings will set the stage for an examination of the full evidentiary record compiled by the TIRC.

¶ 17                                             A

¶ 18    For starters, petitioner's allegations surfaced as soon as they possibly could: at his bond-court appearance on January 21, 1988, the day after his statement was taken. George Zuganelis, petitioner's attorney at the time, told the court that petitioner reported being beaten in the "chest,

side, and leg" while in police custody. Zuganelis asked the court to order a medical evaluation. The court granted the request, and the order denying bond thus says at the top, "1st HOSPITAL." The transcript from the next court date, February 5, indicates that the examination had not taken place. Zuganelis renewed the request, and the court granted it again. As the TIRC later observed, "it is unclear from the record whether the doctor's exam ever occurred, but [petitioner] told TIRC it eventually occurred 21 days after his arrest."

¶ 19                                                    B

¶ 20     Among other grounds for suppression, petitioner alleged before trial that his confession was physically coerced by Summerville and Kato.

¶ 21     In sum, petitioner testified at the suppression hearing that he was handcuffed on the porch of his mother's house and taken to Area 4 in the custody of Kato and other officers. (This despite the fact that he had spoken to Kato and agreed to come in to answer some questions, having been assured by Kato that it was "nothing serious.") He arrived around 10 or 10:30 p.m. on January 18, 1988, and was taken directly to an interrogation room. Alone with petitioner, Kato asked him about the murders. When petitioner said he knew nothing, Kato slapped him "upside the head" and punched him twice in the stomach. Before leaving, Kato threatened to "keep doing the same thing over and over" until petitioner answered his questions. When Kato returned, perhaps half an hour later, petitioner again denied any knowledge of the murders. Kato hit him in the head; kicked him in the side, chest, and leg; and "chopped"—as in "karate-chopped"—his neck.

¶ 22     Petitioner told Kato that his girlfriend, Serena, could confirm his whereabouts at the time of the murders. Kato said he would bring Serena to the room and admonished petitioner not to

say anything to her other than, "tell the truth." So that is what petitioner said. But when Serena asked petitioner what was wrong, he began to speak, and Kato whisked Serena back out of the room. Alone again with petitioner, Kato said that he got the truth from Serena. Kato told petitioner to stand up and then punched him in the stomach and slapped him upside the head.

¶ 23    Meanwhile, Washington was being interrogated in the room across the hall. Kato had petitioner look at Washington through the window and said, in so many words, that Washington was incriminating him. Kato took both suspects to the room where petitioner was being held, asked Washington a few questions, to which he answered "yes," and took Washington back to the other room. When petitioner insisted that Washington was lying, Kato slapped him in the head, kneed him in the stomach, and chopped his neck. Before leaving, Kato reiterated that "this was going to keep happening until [he] answer[s] something about that murder."

¶ 24    By the time Kato returned, some two hours later, it was around 2 a.m. on January 19. Petitioner asked to speak to his aunt, Vanetta Brown, who had accompanied petitioner and the officers to Area 4. Kato said she went home. (Brown testified that she left around 2:30 a.m., after the police refused her requests to speak to petitioner.) Petitioner asked to call his mother instead, so she could get him a lawyer. Kato said no.

¶ 25    Petitioner was left alone in the interrogation room until 4 or 4:30 p.m. He was unable to sleep, had nothing to eat, and was not allowed to use the bathroom. Kato eventually returned and told petitioner that he had to take a lie detector test; if he passed, he could go home, but if he failed, he would be handcuffed, and things would be "worse" for him than they had been so far.

¶ 26    Petitioner was taken to 11th and State, where he finally used the bathroom and took the

polygraph. He was taken back to Area 4 in handcuffs and put in the room across the hall, where Washington had been. Kato accused him of lying and made like he was walking out of the room. Along the way, he stopped to "back kick[ ]" petitioner and slap him in the head.

¶ 27    About 15 minutes later, Summerville moved petitioner back to his original room, put a chair against the door, and picked up where Kato left off. He slapped petitioner in the head and kicked him "between [his] legs." He "kept faking" and "weav[ing]," as if boxing, "until he got a good shot," and then hit petitioner in the ribs and kicked his leg with his "hard boots."

¶ 28    Petitioner hit his breaking point and said that he would do whatever was asked of him. But then he asked for a lawyer, prompting Summerville to retort, "sure, you can have a lawyer. Which lawyer do you want first, the left or the right[?]" Summerville punched petitioner in the back until he repeated that he would do whatever the detectives wanted.

¶ 29    Kato soon returned and said, "See, I told you, if you did what we want you to, you could have been home by now." Summerville left, and Kato began rehearsing the statement petitioner was to give. Kato went back and forth between petitioner and Washington and, in the process, fed petitioner information to ensure that the two statements said the same thing. Petitioner "was trying [his] best to agree because [he] didn't want them beating on [him] again." Kato assured petitioner that he was "just the driver of the getaway car" and that the police didn't really "want" him; they just wanted petitioner "to help [them] get these guys." Kato also told petitioner that if he did well on the statement, he could go home.

¶ 30    Petitioner spent a second night in custody. Around 8 a.m. the next morning, January 20, he spoke privately with Assistant State's Attorney (ASA) David Lavin for a few minutes.

Petitioner said that he knew nothing about the murders, that the detectives beat him and were forcing him to sign a confession. ASA Lavin left the room, and the detectives returned. Kato told petitioner that he "almost messed up" his chance to go home and slapped him in the head, while ASA Lavin stood at the door. Petitioner assured the detectives that he would "do it."

¶ 31     Petitioner's statement was taken by the court reporter, with Summerville and ASA Lavin present. He was not read his *Miranda* rights. He did not read the court-reported statement that was produced in his name, since ASA Lavin told him that he could go home if he signed it. Once he signed it, Summerville promptly arrested him.

¶ 32     Kato, Summerville, and ASA Lavin testified to a very different version of petitioner's interrogation and statement. According to the detectives, petitioner came to the station with them from his aunt's house, not in handcuffs, but voluntarily, and not on the night of January 18, but rather the next morning—thus beginning a shorter and not nearly so coercive stay at Area 4.

¶ 33     Petitioner and Washington were questioned simultaneously, and the detectives would at times go back and forth between them. But the entire process, as the detectives would tell the story, was strictly by the book, for petitioner and Washington alike.

¶ 34     Petitioner was not denied food, sleep, or bathroom access. No threats or promises of any kind were made. Neither the detectives nor the ASA ever told petitioner that he could go home if he made a statement. Petitioner never complained about his treatment, and ASA Lavin did not observe any injuries or witness any acts of abuse. He did, however, read petitioner his rights—as the detectives had done earlier. And most importantly, for our purposes here, Summerville and Kato both expressly denied that petitioner was slapped, punched, kicked, karate-chopped, or

otherwise physically abused.

¶ 35     Two final points from the suppression hearing. First, emergency medical technician (EMT) Edward Hamilton examined petitioner at the jail on January 21, 1988. Hamilton testified that during his admittedly limited exam—from the waist up—he did not observe any bruises, cuts, or swelling. Hamilton asked petitioner if he had any head or chest injuries, and petitioner said no. Petitioner testified that Hamilton never asked these questions, and he acknowledged that he did not tell Hamilton that he was beaten by the police.

¶ 36     Second, petitioner's and Washington's suppression motions were heard together, and the allegations and testimony were often similar. Like petitioner, Washington claimed (among other forms of abuse) that Kato "chopped" him and that Summerville kicked him in the shins and thighs. Washington further claimed that the entire substance of his statement was false, and that he complained of pain in his ribs when he arrived at the jail. The EMT who examined him at the jail testified that Washington made no such complaints, and he did not observe any injuries, bruises, or cuts to Washington's ribs or back.

¶ 37                                              C

¶ 38     Petitioner's confession was the centerpiece, if not the entirety, of the State's case at trial. And so it was equally central to his defense: his largely uncorroborated confession, having been beaten out of him by the police, was false and unworthy of belief. To this end, petitioner took the stand and testified to the alleged physical abuse inflicted by Kato and Summerville. We will not recount his testimony in detail here. Suffice it to say, as the TIRC observed, that petitioner's trial testimony was consistent, in essentials, with his testimony at the suppression hearing. In their

own testimony, Summerville, Kato, and ASA Lavin again denied petitioner's allegations, and EMT Hamilton testified again to his examination of petitioner at the jail.

¶ 39 The trial also featured testimony from attorney Zuganelis, who represented petitioner at his bond hearing and had since withdrawn from the case. Zuganelis testified that petitioner's mother sent him to Area 4 to check on petitioner. He arrived around 7 p.m. on the day (or possibly two days) before his initial court appearance. Petitioner was crying. Zuganelis noticed a mark on petitioner's white sweater, in the middle of the chest, that looked like a footprint. After hearing petitioner's account of his custodial interrogation, Zuganelis had petitioner lift his shirt. He saw red and blue marks on petitioner's chest, abdomen, and arms.

¶ 40 At the courthouse the next day, Zuganelis took petitioner's sweater and kept it in his desk drawer for a year and a half, before turning it over to trial counsel. When the sweater was entered into evidence at trial, Zuganelis acknowledged that he could not discern a footprint on it.

¶ 41 The State also introduced a photo of petitioner, taken after his custodial statement. He is wearing the white sweater underneath an outer garment, but the center of the chest is exposed. At trial and ever since, the State has maintained that the photo puts the lie to Zuganelis's testimony, since the alleged footprint is not visible. Zuganelis acknowledged that he was convicted of a misdemeanor offense of failing to file an income-tax return.

¶ 42 Petitioner's trial counsel also moved *in limine* to admit testimony from two jail inmates, George Lewis and Kenneth Crawford, that they were beaten by Kato during their own custodial interrogations in September 1988 and June 1989, respectively. The trial court denied the motion, finding that petitioner's allegations of physical abuse were unsupported and even contradicted by

the evidence, thus rendering the proposed testimony irrelevant.

¶ 43    That ruling was challenged and affirmed on direct appeal in 1993. This court held that the evidence of petitioner's alleged abuse and physical injury while in police custody was too conflicting, and his allegations too "general in nature," for the proposed testimony to pass what we would now call Rule 403 balancing. *Murray*, 254 Ill. App. 3d at 552-53.

¶ 44                                        III

¶ 45    Counsel for petitioner filed a TIRC claim form on January 4, 2012. The TIRC's executive director interviewed petitioner, and after a review of the full evidentiary record, the TIRC found "sufficient evidence of torture to merit judicial review" and referred the claim to the circuit court. 775 ILCS 40/50 (West 2012). The TIRC's initial referral was dismissed on jurisdictional grounds: petitioner's claim did not fall within the TIRC's jurisdiction under the version of the TIRC Act in effect, as the alleged torture was not at the hands of Jon Burge or his subordinates.

¶ 46    The TIRC Act was later amended to include claims of police torture in Cook County generally, without limitation to Burge. 775 ILCS 40/5 (West 2016) (as amended by Public Act 99-688 (eff. July 29, 2016)). In May 2017, after the amendment, the TIRC again referred the petition for "post-commission judicial review" and the "hearing" that review entails. *Id.* § 50(a). The referral was based on the following evidence and findings, as set forth in the TIRC's "Case Disposition."

¶ 47                                         A

¶ 48    The TIRC identified five factors weighing in favor of petitioner's claims and four factors weighing against them. The factors weighing in petitioner's favor, lightly edited for clarity and at

times expanded upon for context, are the following:

      a.     Zuganelis's testimony that he saw bruises on petitioner's torso and a boot print on his sweater, which Zuganelis took from petitioner at his initial court appearance, preserved in its original condition, and then turned over to trial counsel.

      b.     The "general consistency" of petitioner's claims. Petitioner immediately alleged police abuse, the day after his confession, and testified consistently on this topic at his suppression hearing and trial. What's more, the lack of any physical evidence against petitioner "may have provided a motive to induce a confession."

      c.     "Significant Pattern and Practice evidence of abuse allegations against Detectives Kato and Summerville." We summarize this evidence below.

      d.     Summerville's conviction for sexually abusing women in custody after their arrests. "[A]t a minimum," the TIRC found, the conviction "raises serious credibility issues with [his] testimony." Details to follow, in our summary of the pattern-and-practice evidence.

      e.     The judge at petitioner's suppression hearing and trial was Thomas J. Maloney. This was the last case Maloney heard before his arrest and conviction, in Operation Graylord, of taking bribes to fix cases. See *United States v. Maloney*, 71 F.3d 645, 650-51 (7th Cir. 1995). Evidence that Maloney was aware of the federal inquiry at the time of these proceedings raises a possibility that his rulings were an attempt to deflect suspicion—the product of "compensatory bias," meaning that he "favor[ed] the State" in cases where he was *not* bribed "as a means of hiding and promoting his own

corruption." *Bracy v. Schomig*, 286 F.3d 406, 436 (7th Cir. 2002); see *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997).

¶ 49    The factors weighing against petitioner are these:

a.      EMT Hamilton's testimony that his jail-intake examination revealed no evidence of injury.

b.      Petitioner's own assertion to the TIRC that his defense attorneys took pictures of him shortly after his arrest, but his attorneys decided not to introduce them, since they did not show any visible marks on his body.

c.      Petitioner's credibility was "suspect in at least some aspects." In his trial testimony, he "downplayed" any affiliation with Sam McKay, the Black Souls leader who ostensibly ordered the murders. But petitioner later admitted to the TIRC that it was "Sam" who arranged for Zuganelis to go to Area 4 and represent petitioner.

d.      Zuganelis's credibility was diminished by his misdemeanor conviction for failing to file an income tax return. It was further diminished by the conflict between his testimony that petitioner's mother arranged for him to go to Area 4, and petitioner's own admission that it was "Sam" who sent Zuganelis.

¶ 50                                              B

¶ 51    The "[s]ignificant" pattern-and-practice evidence cited by the TIRC includes Kato's and Summerville's Office of Professional Standards (OPS) complaint registers, and the TIRC's summary of allegations against the two detectives, in a subset of the known cases, culled from judicial opinions and other sources. A high-level summary will suffice for our purposes here. On

remand, the circuit court can home in on the finer points of detail, when the time comes to rule on the merits of petitioner's claim.

¶ 52    Kato's OPS complaint register lists 37 complaints. The earliest dates from March 1988, about two months after petitioner's interrogation and initial allegation of abuse in bond court. For context, Kato's testimony at the suppression hearing and trial indicated that he was promoted to detective and assigned to Area 4 sometime in early 1987, just a few months before the Fowler and Buck murders. The TIRC's sources document allegations dating back to 1985, in Kato's pre-detective days, when, it seems, he was not infrequently accused of excessive force on the beat. But our primary focus is on allegations of physical abuse by Detective Kato during custodial interrogations. And of all the people who have made such allegations over the years, petitioner was at or near the very front of the line, as far as the evidence of record shows.

¶ 53    The TIRC's summary includes numerous allegations of being slapped, punched, kicked, and otherwise hit in the face, head, ribs, and torso, and other predictable areas of the body. These allegations are apt to be described, including by our own cases, as "general" or "generic," insofar as they do not allege any particularly distinctive or esoteric forms of physical abuse. Fair enough. But a generic beating can be just as effective as more unusual methods, and a petitioner who suffers a generic beating at the hands of the police should not have his allegations written off, or deemed not to fit within a documented pattern and practice, for this reason alone.

¶ 54    All of which is to say that petitioner's more "generic" allegations sound quite similar to many of the allegations that would be directed against Kato in the years to come. And there is one more distinctive form of physical abuse alleged by petitioner and by at least five others listed

- 14 -

in the TIRC sources: "chopping" or "karate chopping."

¶ 55    Kato has been accused of physically abusing and coercing complainants in collaboration with various partners. But it is noteworthy that at least five different complainants have alleged that Kato and Summerville acted together. And that does not include codefendant Washington.

¶ 56    The TIRC properly noted that OPS deemed all the complaints in the register either not sustained, unsubstantiated, or exonerated. But it also noted that there have been judicial findings of physical abuse and coercion by Kato. Among the most pertinent is Michael Cage, whose confession was suppressed after he testified that he was beaten by three detectives, including Summerville and Kato, in 1988—the same year as petitioner.

¶ 57    And we reversed the conviction of Ezekiel McDaniel, finding that the confession Kato obtained was involuntary. *People v. McDaniel*, 326 Ill. App. 3d 771 (2001). The principal basis for our holding was Kato's refusal to allow the 14-year-old defendant to confer with his parents during the interrogation, so we did not need to specifically address his allegations that Kato also chained him to a wall and slapped him around. But we did find that Kato's suppression-hearing testimony on the dispositive issue was manifestly "not truthful," and thus that his testimony on other aspects of the interrogation—the alleged physical abuse, for example—was "suspect as to believability." *Id.* at 777-78, 781.

¶ 58    Lastly, the TIRC documented at least three cases that resulted in acquittals, where the likely reason for the verdicts was the clear inconsistency between the confession that Kato (and in one case, Kato and Summerville) obtained and physical evidence that surfaced in the case.

¶ 59    As for Summerville, his OPS complaint register lists 19 complaints, dating back to April

1989, including one for "neglect of duty/conduct unbecoming" that was sustained. As we noted above, at least five complainants allege that they were beaten by Summerville and Kato together. Many of the complaints could be called "generic," in the sense we described above, but multiple complainants specifically allege, like petitioner, that Summerville kicked them in the groin.

¶ 60    "Most seriously," in the TIRC's view, Summerville sexually abused several women in his police car after arresting them. Four such complaints were sustained, leading to Summerville's 1993 conviction for criminal sexual abuse. In light of that conviction and Summerville's reported drug problem, one circuit judge reopened a motion to suppress that was previously denied and granted the motion after Summerville said that he would take the fifth. Among other allegations, Summerville hit the defendant in the throat, kicked him in the groin, and bashed his ribs with a flashlight. *Washington v. Summerville*, 127 F.3d 552, 553-54 (7th Cir. 1997) (federal civil-rights case arising from underlying prosecution in state court).

¶ 61                                             C

¶ 62    The TIRC drew several "conclusions" from the above evidence. It first observed that "[t]his case is remarkable" for the sheer number of people who held petitioner's legal fate in their hands who were later convicted of crimes (Summerville, the judge, and his initial attorney, though only a tax-related misdemeanor). This disturbing circumstance raised serious questions about the credibility of several key actors in the legal process petitioner received.

¶ 63    Summerville was a violent sex offender, and Judge Maloney was a corrupt racketeer. In both instances, it must be said, their felonies seriously impugned the integrity of their offices and the administration of justice. The "suspect" credibility "on the State's side, and on the bench" led

the TIRC to doubt that petitioner "ever received a fair consideration of his motion to suppress."

¶ 64    The TIRC found it "troubling" that no contemporaneous record of petitioner's time at Area 4 was generated. The detectives did not take notes during the interrogation, and ASA Lavin did not produce a felony review memo. These "irregularities" compound the already significant credibility questions on the State's side of the ledger.

¶ 65    On petitioner's side, his first attorney, Zuganelis, tarnished his own credibility with a misdemeanor tax crime. That said, his crime apparently involved only negligence, not dishonesty. Perhaps more "troubling" is the conflict between Zuganelis's testimony and petitioner's own statement to the TIRC about who dispatched Zuganelis to Area 4.

¶ 66    Worse yet for petitioner, that same topic casts doubt on his *own* credibility, given his efforts at trial to disavow any connection to McKay, while later telling the TIRC that it was "Sam" who sent Zuganelis. It thus appears that petitioner "was less than truthful at trial."

¶ 67    Cutting against petitioner's claim is EMT Hamilton's testimony that he did not see any bruises on petitioner and, for that matter, petitioner's own statement to the TIRC that the photos taken shortly after the alleged abuse did not show any marks. But petitioner did promptly request a proper medical examination by a doctor—a request granted by the bond-court judge and then "ignored for weeks by jail authorities." Through no fault of his own, petitioner thus lost "any opportunity [he] might have had to counter this evidence."

¶ 68    All told, the case is rife with conflicting evidence and "credibility issues." But the "early outcry" at petitioner's bond hearing and the "consistency of [his] claims" do provide "[c]redible evidence for a court to consider." And both detectives have "lengthy abuse allegation histories"

that cannot be ignored. Considering all of these factors, both for and against petitioner's claim, and fully aware of the conflicts in the evidence and the credibility issues all around, the TIRC found "no question as to the sufficiency of the evidence meriting judicial review in this case."

¶ 69                                    IV

¶ 70    In the circuit court, counsel filed a combined petition that realleged the statutory claim of torture under the TIRC Act and raised several constitutional claims under the Post-Conviction Hearing Act. The postconviction claims include a due-process claim, alleging that petitioner's statement was coerced; actual innocence; a *Brady* violation, based on the State's suppression of pattern-and-practice evidence; judicial misconduct; and ineffective assistance of counsel.

¶ 71    The combined petition supplements the pattern-and-practice evidence compiled by the TIRC, adding, by our count, four more cases involving allegations of beatings and other coercion by Kato. The petition also includes several affidavits of note.

¶ 72    The first is from codefendant Washington. After reiterating his allegations of abuse by Kato and Summerville, and his own role in the murders, Washington attested that petitioner was not the getaway driver; was not part of the group that carried out, and was not even present for, the hit on Smitty's crew; and did not attend the meeting at which McKay ordered the hit. As far as Washington knew, petitioner was working his assigned spot at the time selling drugs. McKay's own affidavit attests that petitioner was, in fact, working for him—selling drugs on his usual corner—when Fowler and Buck were murdered at McKay's behest.

¶ 73    As for why Washington falsely included petitioner in the group of Black Souls who were involved in the hit, he said he was angry at petitioner—in part because of an old beef about drug

territory, but more importantly, because petitioner "was messing around with [his] girlfriend."

¶ 74    The other noteworthy affidavit was from petitioner's lead trial counsel, Karen Shields, then an assistant public defender who later served for 12 years as a judge in the circuit court of Cook County. Shields attested that during the defense's closing argument at petitioner's trial, Maloney closed his eyes and turned his back to counsel—as if to say to the jury that the defense did not deserve to be heard. Shields had to deliver her closing argument with the jury staring at the judge's conspicuously inappropriate conduct, rather than paying attention to her.

¶ 75                                              V

¶ 76    That brings us to our final topic: the circuit court's *sua sponte* denial of petitioner's TIRC claim, on the merits, without an evidentiary hearing. A brief recap of the procedural history leading up to this ruling will help put it into context.

¶ 77    After the TIRC referral, Judge Reddick conducted a "preliminary review[ ]" and found "that there is sufficient cause for the [TIRC claim] to proceed" to a hearing. Judge Reddick also advanced the postconviction claims to the third stage. The combined petition was thus set for an equally combined hearing: "a third stage hearing [and] a TIRC inquiry hearing that will be heard simultaneously," as the minute order described it. The case was eventually transferred to the circuit court of Will County and assigned to Judge Carlson, who has since left the bench.

¶ 78    Acting through appointed special prosecutors, following the recusal of the Cook County State's Attorney's Office, the State moved to dismiss the TIRC claim on various constitutional, justiciability, and administrative-law grounds. It bears emphasis that these arguments pertained to the legality of the TIRC Act itself and not to the individual merits of petitioner's claim. (Those

constitutional issues are not before us on appeal.)

¶ 79    The circuit court addressed the State's section 2-615 motion in an oral ruling. While the remedial process created by the TIRC Act "skirts very closely to the edge of constitutionality," the circuit court would not go so far as to strike it down. But it is a "terrible," even "insane," law, said the court, for a host of disparate reasons, only some of which had to do with the State's legal arguments, and most of which are irrelevant to this appeal. So we will not wade through all the details of the circuit court's open-ended and disparaging excursus into the TIRC Act. Instead, we focus on the specific complaints that, to our eye, led the circuit court to dismiss the TIRC claim on the merits, for a lack of evidentiary support, in what was ostensibly a ruling on the legality of the TIRC referral process itself.

¶ 80    The TIRC Act, said the court, "essentially delineates a new constitutional due-process violation," albeit in a statutory garb. But these claims, in the circuit court's view, are "more well-suited to be heard in a post-conviction proceeding" than in the novel and problematic process created by the TIRC Act. For one, "the evidence presented in the TIRC referral is very subjective" and involves "a lot of interpretation." In contrast, "[i]n the post-conviction third stage or second stage, *** I, as the Court, look at the evidence objectively."

¶ 81    What's more, said the court, the TIRC Act and relevant appellate precedents "say[ ] you have to have an evidentiary hearing." But "[w]hat is that evidentiary hearing? We don't know." The circuit court went on to assert that both "the statute" and "a progeny of cases" "state[ ] *** that it is within my sole discretion as to how the evidentiary hearing proceeds."

¶ 82    The circuit court expressed no such confusion about a third-stage evidentiary hearing on

a postconviction claim. It never claimed unfettered discretion to conduct a third-stage hearing in any way it saw fit. And it was clearly aware of our precedents analogizing a post-TIRC hearing to a third-stage hearing, having cited them in its oral ruling.

¶ 83    Pending further clarification from the appellate court regarding the apparently elusive concept of a post-TIRC evidentiary hearing, the circuit court would "proceed to an evidentiary hearing by way of reviewing the petitions presented by TIRC and the findings thereof." The court's own solitary review of the "pleadings"—that is, the paper record presented by the TIRC—"satisfied the idea that there has to be an evidentiary hearing." No need for live testimony, and no opportunity for counsel to expand the evidentiary record compiled by the TIRC—or, for that matter, to even orally *argue* the merits of petitioner's TIRC claim.

¶ 84    Rather, "accepting the evidence and findings for purposes of an evidentiary proceeding," the circuit court found that petitioner "ha[s] not met [his] burden" and thus "deni[ed]" the TIRC claim "at the third stage, whatever you want to call it." In the same breath, the circuit court also said that the evidence presented in the referral "is not sufficient to go forward on a TIRC claim." These are two different rulings, as we will see, whether the circuit court—or the parties on appeal—realized it or not. Counsel for petitioner "object[ed] to the dismissal without holding something akin to a third-stage evidentiary hearing."

¶ 85    The circuit court added that its ruling on the TIRC claim had no collateral-estoppel effect "in a pleading regarding the recognized postconviction relief, which includes voluntariness of confessions." Those "recognized" claims would thus proceed to a third-stage postconviction hearing, which the court stayed pending the outcome of this appeal.

¶ 86                                     ANALYSIS

¶ 87    In his lead argument, petitioner claims he has already proven his claim of torture and so should be granted a new trial without further ado. Alternatively, if we find it "premature" to reach the merits of his claim, he asks us to remand it for a proper evidentiary hearing.

¶ 88                                          I

¶ 89    We typically begin with our standard of review. But our standard depends on what we are reviewing. And that is most of the problem here. The circuit court (which, in fairness, was unaccustomed to TIRC claims typically tried in Cook County) was unsure of the process, believing it could hold whatever kind of hearing it deemed appropriate. And the parties, perhaps grappling with the confusion of the hearing that took place below, principally (not entirely) treat it on appeal as the judicial evidentiary hearing envisioned in the TIRC Act. Thus, petitioner claims that his evidence was "unrebutted" and warrants a new trial with a suppression of his confession. The State claims the court properly evaluated the evidence and should be affirmed.

¶ 90    Indeed, only Judge Reddick, the Cook County judge who presided over this matter before discovering a conflict of interest with the Cook County judiciary, had the procedure down cold. We explain why with a brief review of the TIRC process, step by step.

¶ 91                                         A

¶ 92    The TIRC Act provides "an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture." 775 ILCS 40/10 (West 2022). This court analogized this procedure to the three stages of postconviction review. *People v. Christian*, 2016 IL App (1st) 140030, ¶¶ 68-78. Perhaps this is where the confusion began for the circuit court,

which discussed *Christian* in trying to work its way through the TIRC Act. As we discuss below, *Christian*'s analogy to postconviction proceedings is surely helpful and generally accurate, but that decision never intended to be, and should not be read as, a *literal* step-by-step walk through the TIRC Act—because if it is, it missed a step.

¶ 93     As *Christian* noted, the TIRC conducts an initial screen of claims to weed out any that plainly lack merit, much as the circuit court does at the first stage of postconviction review. *Id.* ¶¶ 68, 78. Second, the TIRC may conduct a formal inquiry into a claim that appears to have some merit, and when the formal inquiry is complete, the TIRC votes on whether to refer the claim to the circuit court for judicial review. *Id.* ¶¶ 68-72. This, we said, is "roughly comparable" to the second stage of postconviction review. *Id.* ¶ 78. So far, so good.

¶ 94     But last, *Christian* noted that, after a TIRC referral, the circuit court holds an evidentiary hearing, the equivalent of "the third stage evidentiary hearing" in a postconviction hearing. *Id.* It is surely true that a TIRC evidentiary hearing mirrors a third-stage postconviction hearing—but there is an interim step for the circuit court in a TIRC referral. The analogy breaks down here because every stage of the postconviction procedure is conducted by a court, while TIRC proceedings are bifurcated between a state commission and a court. That distinction matters.

¶ 95     A referral from the TIRC is *not* a finding that torture actually occurred. *People v. Johnson*, 2022 IL App (1st) 201371, ¶ 76. Rather, a TIRC referral is a finding that "there is sufficient evidence of torture to merit judicial review." 775 ILCS 40/50(a) (West 2022). So yes, the TIRC's referral, finding that a claim warrants an evidentiary hearing, is much like a second-stage postconviction ruling that would advance the claim to a third-stage evidentiary hearing.

¶ 96     But because, in the TIRC context, the decision that an evidentiary hearing is warranted is made by a commission, not a court, the court must first review that final decision. Indeed, the TIRC Act expressly adopts the Administrative Review Law. See 775 ILCS 40/55(a) (West 2022) ("the decisions of the Commission are final and are subject to review as final decisions under the provisions of the Administrative Review Law, and shall only be overturned if the court finds that they are against the manifest weight of the evidence").

¶ 97     The "decision" to be reviewed, again, is not whether torture occurred but whether "there is sufficient evidence of torture to merit judicial review." *Id.* § 50(a). *That* is the first step the circuit court takes—to determine whether it agrees with the TIRC that there is sufficient evidence to advance the claim to an evidentiary hearing.

¶ 98     And that TIRC final decision is subject to the deferential manifest-weight standard of review in the circuit court. *Id.* § 55(a). If the TIRC's decision is not against the manifest weight of the evidence, an evidentiary hearing is required on the claims of torture. As we summarized in *Johnson*, 2022 IL App (1st) 201371, ¶ 76:

> "[T]he TIRC merely makes a threshold determination as to whether there is 'sufficient evidence of torture to merit judicial review.' [Citation.] That is, we do not mean to suggest the circuit court must defer to the TIRC in reaching an ultimate conclusion as to whether any petitioner was, in fact, tortured. Rather, we hold that, upon referral from the TIRC, the circuit court should proceed to hold an evidentiary hearing, *unless the circuit court finds that the TIRC's threshold determination was itself against the manifest weight of the evidence*. Then, based on the evidence adduced at the evidentiary hearing, the

circuit court can independently make factual findings as to whether torture actually occurred." (Emphasis added.)

¶ 99    So if we cling to the analogy to postconviction review, which generally is helpful, we would say that the first stage of postconviction review is like the initial TIRC screening to weed out frivolous claims, but the TIRC Act's equivalent of second-stage postconviction proceedings consists of two parts—(i) TIRC's referral, finding that an evidentiary hearing is warranted, and (ii) the circuit court's determination whether TIRC's decision is manifestly erroneous; if it is not manifestly erroneous, then the TIRC claim advances to an evidentiary hearing before the court. And then, of course, there is the evidentiary hearing for either a TIRC claim or third-stage postconviction relief, hearings that (as we explain later) are functionally identical.

¶ 100   As noted, before discovering a conflict with Detective Kato that prompted the recusal of the Cook County judiciary, Judge Reddick performed this threshold determination. She conducted a "preliminary review[ ]" and found "sufficient cause for the [TIRC claim] to proceed" to an evidentiary hearing, which she scheduled as a combined hearing along with third-stage postconviction review.

¶ 101                                    B

¶ 102   We promised a standard of review. But given all that we have outlined above, it remains unclear precisely what step the circuit court in Will County thought it was taking when it dismissed this TIRC action. A review of the transcripts suggests that the circuit court was unaware that Judge Reddick had already made the threshold determination that an evidentiary hearing was warranted. And of course, the circuit court could have revisited that interlocutory

ruling and reached a different conclusion, anyway. See *People v. Johnson*, 2017 IL 120310, ¶ 33.

¶ 103   Simply put, the circuit court's oral ruling does not clearly distinguish between the threshold review of a TIRC referral, based on the record compiled by the TIRC, and holding a petitioner to his ultimate burden of proof, based on the evidence presented at a judicial evidentiary hearing.

¶ 104   In one breath, the circuit court found that petitioner "ha[s] not met [his] burden" but went on to say that the evidence is "not sufficient to go forward on a TIRC claim," then concluded by "denying [the TIRC claim] at the third stage, whatever you want to call it." Since the court did not hear testimony or otherwise receive evidence at a hearing, all of this was done on the papers alone—the "pleadings," the "findings," and the "evidence and facts" to be found in the record that the court received from the TIRC on administrative review.

¶ 105   The circuit court's statement that the evidence "is not sufficient to go forward on a TIRC claim" sounds like threshold review, a potential revisiting of Judge Reddick's "preliminary" finding "that there is sufficient cause for the [claim] to proceed" to a hearing. But if the circuit court thought that petitioner's claim failed threshold review, and did not merit a hearing, it should have dismissed the referral on that basis, and that would have been that.

¶ 106   Instead, the circuit court declared that its review of the TIRC record—the basis on which a *threshold* review is to be conducted—also qualified as an "evidentiary hearing" on the *merits* of the claim. Based on that so-called hearing, the court decided that petitioner did not meet his "burden" and denied his claim "at the third stage," so to speak.

¶ 107   So we do not know which kind of hearing the court actually conducted. We can only say,

for the reasons stated below, that we would reverse the court's judgment in either circumstance.

¶ 108                                                     C

¶ 109    If we were reviewing the ruling after an evidentiary hearing on a TIRC claim, we would review the decision for manifest error. *People v. Fair*, 2024 IL 128373, ¶ 80. We would employ a deferential standard of review, as we recognize that the circuit court is in a superior position to weigh and evaluate the evidence, to make credibility determinations, and the like. *Id.* ¶ 97.

¶ 110    Here, however, over petitioner's vehement and repeated objections, the circuit court unilaterally dispensed with all live testimony and party presentation of evidence and decided petitioner's TIRC claim based on the court's solitary review of a paper record. That was not an evidentiary hearing. And the State does not claim it was. That point is not disputed.

¶ 111    As discussed above, we have noted that a post-TIRC evidentiary hearing is "akin to" a third-stage hearing on a postconviction claim. *People v. Gibson*, 2018 IL App (1st) 162177, ¶ 85 (*Gibson I*); *Christian*, 2016 IL App (1st) 140030, ¶ 78. We will now tighten the screws: for all practical purposes, an evidentiary hearing on a TIRC claim is the same as a third-stage postconviction hearing.

¶ 112    There is no principled reason to believe an evidentiary hearing on a TIRC claim should be treated any differently than a third-stage postconviction hearing—and every reason to believe they should be subject to the same rules and standards.

¶ 113    For one, as we observed in *Gibson I*, 2018 IL App (1st) 162177, ¶ 135, "section 50(a) of the [TIRC] Act is taken, verbatim, from section 122-6 of the Post-Conviction Hearing Act," with

minor exceptions (in the non-italicized text below) that are irrelevant here. Consider section 50(a) of the TIRC Act:

> "*The court may receive proof by affidavits, depositions, oral testimony, or other evidence. In its discretion the court may order the petitioner brought before the court for the hearing.* Notwithstanding the status of any other postconviction proceedings relating to the petitioner, *if the court finds in favor of the petitioner, it shall enter an appropriate order with respect to the judgment or sentence in the former proceedings and such supplementary orders as to rearraignment, retrial, custody, pretrial release or discharge*, or for such relief as may be granted under a petition for a certificate of innocence, *as may be necessary and proper.*" (Emphases added.) 775 ILCS 40/50(a) (West 2022).

¶ 114    Compare that to third-stage hearings governed by section 122-6 of the Post-Conviction Hearing Act:

> "The court may receive proof by affidavits, depositions, oral testimony, or other evidence. In its discretion the court may order the petitioner brought before the court for the hearing. If the court finds in favor of the petitioner, it shall enter an appropriate order with respect to the judgment or sentence in the former proceedings and such supplementary orders as to rearraignment, retrial, custody, conditions of pretrial release or discharge as may be necessary and proper." 725 ILCS 5/122-6 (West 2022).

¶ 115    Comparing the two statutes should dispel any notion that they call for fundamentally different hearings. " 'When the legislature uses identical language to prescribe identical provisions, absent evidence of a contrary intent, the only logical conclusion to be drawn is that

the legislature intended that the two provisions have the same meaning and be interpreted identically.' " *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 373 Ill. App. 3d 866, 869 (2007) (quoting *In re S.P.*, 323 Ill. App. 3d 352, 357 (2001)).

¶ 116   We would add that the TIRC Act itself states that its provisions apply "[n]otwithstanding the status of any *other* postconviction proceedings" and that any relief provided thereunder does not affect the petitioner's "rights to *other* postconviction relief." (Emphases added.) 775 ILCS 40/50(a), 55(b) (West 2022). Clearly, a TIRC claim is another species of postconviction relief. Which is why, just as in postconviction proceedings, evidentiary hearings on TIRC claims are not subject to the rules of evidence. See Ill. R. Evid. 1101(b) (eff. Apr. 8, 2013); *Gibson I*, 2018 IL App (1st) 162177, ¶ 138 (TIRC evidentiary hearings are "postconviction hearings" exempted from rules of evidence).

¶ 117   The circuit court did not see it that way. The court believed that it was "within [his] sole discretion as to how the evidentiary hearing proceeds." But the only "discretion" mentioned in section 50(a) is whether to writ the petitioner in for the hearing. So too for section 122-6.

¶ 118   True, section 50(a) of the TIRC Act states that "[t]he court may receive proof by affidavits, depositions, oral testimony, or other evidence." 775 ILCS 40/50(a) (West 2022). The circuit court expressed confusion about the permissive "may" and wondered what it could mean, if not that the court had "sole" discretion to decide how to conduct a hearing.

¶ 119   The point of this provision is simply to give the court and the parties some flexibility in the presentation of evidence. For example, a far-off witness has simple, undisputed testimony, so an affidavit may be a more sensible way to proceed than arranging for the witness to appear and

testify at the hearing. Or, because TIRC cases often have significant age on them, a witness is now deceased or cannot be located, but that individual once gave a deposition or trial testimony on this topic in another forum.

¶ 120 The word "may" in that context does not grant "sole" or unfettered discretion to cancel the presentation of evidence altogether. It does not authorize the court to deny a petitioner, in wholesale fashion, any chance to present live witnesses whose accounts of the facts need to be believed for the petitioner's claim to prevail. He must be allowed to put on his case.

¶ 121 It bears emphasis that section 122-6 of the Post-Conviction Hearing Act uses the same permissive language. Imagine if a postconviction claim advanced to the third stage, the petitioner was present with witnesses to call and evidence to admit, but the circuit court simply called the hearing off and made findings based on the affidavits and pleadings. Surely we would swiftly reverse that ruling and remand for a proper evidentiary hearing. We would do so with the reminder that the very point of an evidentiary hearing is to allow the circuit court to do what cannot be properly done on the papers alone—determine who is credible and who is not, what evidence deserves more weight and which deserves less, and ultimately decide whether the petitioner has carried his burden of proof. See *Fair*, 2024 IL 128373, ¶ 97; *People v. Coleman*, 183 Ill. 2d 366, 384 (1998).

¶ 122 We arrive at that conclusion here. If the court considered the "hearing" it held to be the evidentiary hearing contemplated by the TIRC Act, the court erred by not actually *holding* an evidentiary hearing. The parties were entitled to put forth their proof and argue their positions within the bounds of the TIRC Act. The failure to allow them to do so was reversible error.

¶ 123                                    D

¶ 124    If the court thought it was reconsidering Judge Reddick's threshold finding and conducting a preliminary review of TIRC's decision, our standard of review would be different. Again, the TIRC's decision—that a judicial evidentiary hearing is warranted—is subject to the Administrative Review Law. 775 ILCS 40/55(a) (West 2022). The circuit court reviews the TIRC's decision for manifest error. *Id.* If that is where the circuit court's role ends—if the court finds the TIRC's decision manifestly erroneous and dismisses the action without an evidentiary hearing—we would review that decision like any other on administrative review. We would not review the judgment of the circuit court; we would review the decision of the administrative tribunal. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006).

¶ 125    So if that is what the circuit court thought it was doing, we would not review its determination that TIRC's decision was manifestly erroneous. We would review the TIRC decision and make our own judgment as to whether it was manifestly erroneous.

¶ 126    We have no hesitation in holding that the TIRC's final decision, that an evidentiary hearing is warranted on petitioner's claims of torture, was not against the manifest weight of the evidence and was supported by the evidence. The TIRC compiled significant evidence both for and against petitioner's claim in the record. His claim thus merits a hearing.

¶ 127    We will summarize our reasoning briefly, primarily focusing on topics where the parties have raised particular arguments or commentary.

¶ 128    Petitioner's principal evidence of torture is his own sworn testimony. We agree with the TIRC that the consistency of his testimony, throughout his court proceedings, and even more so,

the immediacy of his allegations, on the record on day one in bond court, lend credence to his claim. See *People v. Gibson*, 2019 IL App (1st) 182040-U, ¶¶ 51-52 (*Gibson II*).

¶ 129   We are not persuaded by the accusation that petitioner is trying to pass off copycat allegations as the real thing. For one, his allegations are anything but belated. Even more tellingly, though complaints of beatings at the hands of these detectives, especially Kato, would proliferate in the coming years, petitioner was clearly among the first, if not *the* first, to make this claim. And his allegations came early in Kato's tenure as a detective, before there was any proverbial bandwagon for petitioner to jump on. The timing of his allegations is thus a strong reason to believe that they are true.

¶ 130   A second reason is the "significant" pattern-and-practice evidence in the TIRC record. Perhaps most compelling is the case of Michael Cage, whose confession was suppressed after he testified that it was beaten out of him by Kato and Summerville (and one other detective) in 1988, the same year as petitioner's own interrogation.

¶ 131   As summarized above, Kato and Summerville have lengthy histories of OPS complaints. Many of the complaints allege beatings similar to the beating petitioner alleges here, and at least five of the complainants allege that they, too, were beaten by Kato and Summerville "working together to obtain a false confession." *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 181.

¶ 132   It appears to be true, as the State says, that OPS has never sustained a complaint against Kato, and the complaints it sustained against Summerville were for conduct other than beating confessions out of suspects. It is for the circuit court to decide how much weight the complaints deserve in light of this and any other relevant considerations.

¶ 133   On a threshold review that owes deference to the TIRC, these arguments are premature. For now, we reiterate that OPS does not need to sustain a complaint for a court to consider it as pattern-and-practice evidence. *People v. Anderson*, 2024 IL App (1st) 200462-B, ¶ 191. It must be said, in this context, that many years of police torture passed before OPS sustained a single complaint against Jon Burge or any of his subordinates. And an assessment of the OPS complaints cannot ignore the judicial finding of physical abuse in the Michael Cage case.

¶ 134   Our own adverse credibility finding against Kato in *McDaniel*, 326 Ill. App. 3d at 777-78, 781, is not pattern-and-practice evidence, either, but it must be taken seriously in the context of petitioner's claim. It is not every day that an appellate court declares an officer's testimony at a suppression hearing so manifestly false that a trial court's credibility finding must be reversed.

¶ 135   The TIRC found that Summerville's credibility was called into question by his conviction for criminal sexual abuse. The State argues that the conviction is factually too far afield to have any bearing on petitioner's claim. It may not qualify as pattern-and-practice evidence, in the strict sense, but it is still relevant to an all-things-considered assessment of Summerville's conduct and credibility in this case. That is why the state-court judge in *Washington*, 127 F.3d at 554, reopened a motion to suppress, alleging that Summerville beat a statement out of the defendant, after being apprised of Summerville's conviction and drug problem.

¶ 136   Summerville's conviction is surely relevant to his credibility in general, as the TIRC found. But it is worth putting a finer point on the topic. Summerville was not convicted of off-duty offenses; he used his police power to confine women to a police car and sexually coerce them. So it is also proof, beyond a reasonable doubt, that he has abused his power of arrest to

coerce detainees to his own ends. Granted, this abuse of power is *less* probative than evidence that he beat a confession out of a suspect. It is not for us to say how probative Summerville's conviction is, or how much weight it deserves, in the context of petitioner's TIRC claim. But we decline the State's invitation to declare it entirely out of bounds.

¶ 137  The TIRC reasonably found that the lack of any physical evidence linking petitioner—or anyone else—to the murders gave the detectives a "motive to induce a confession" by whatever means necessary, including physical force. Indeed, the prosecution of this double murder has never been based on anything more than the statements of the Black Souls who were charged.

¶ 138  On the topic of incentives, the State says "[i]t makes no sense that the detectives would beat Petitioner into saying that he was the getaway driver," rather than the second shooter, who remained at large. But remember, petitioner became a suspect only after Washington named him as … the getaway driver. If the detectives were going to coerce a confession out of petitioner, it would make all the sense in the world to get one that squared neatly with Washington's statement, the only other evidence implicating petitioner in the murders. We are not picking one theory over another here—that is for an evidentiary hearing—but we reject the State's attempt to discard this evidence as nonsensical with an argument that, itself, makes little sense.

¶ 139  By our count, there are two main points that favor the State. For starters, petitioner's own credibility does not appear to be beyond reproach. The TIRC found reason to believe that he falsely dissociated himself from McKay in his trial testimony. It is not for us to decide how much of a hit petitioner's credibility should take on this point, but we will say this: a lack of candor on one point that has nothing to do with his allegations of torture is no reason to deny him so much

as a *hearing* on his claim. But at that hearing, to be sure, it is a worthy point favoring the State.

¶ 140    The strongest point in the State's favor is that petitioner's claim lacks any objective corroboration. No amount of other-acts evidence, on which petitioner heavily relies, automatically proves that the detectives beat *him*. To that end, some objective corroboration—in particular, evidence of bruises, swelling, or another injury in police custody that is consistent with the beating he described—would go a long way toward solidifying his case.

¶ 141    To be clear: as we explained in *Gibson II*, 2019 IL App (1st) 182040-U, ¶¶ 42-43, a claim of torture does not generally require physical injury or evidence of physical injury. That said, we might expect the kinds of punches and kicks alleged by petitioner to cause at least some bruises or swelling. And petitioner himself has claimed that he sustained such injuries at Area 4.

¶ 142    Apart from petitioner's own testimony, the only evidence of such injuries comes from Zuganelis, who testified that he saw bruises on petitioner's torso. As corroboration goes, this is admittedly thin. That is in part because Zuganelis has two potential credibility issues of his own, as noted by the TIRC. But the more important point, from our perspective, is that Zuganelis's testimony is not corroborated by any other evidence. To be sure, petitioner *tried* to document the injuries he alleges, and that itself is a point in his favor. But all efforts have come up short. And since the burden is his, that is a point against him.

¶ 143    Petitioner had photos taken of his alleged injuries, but by his own admission, they were not revealing enough for his attorneys to offer them as evidence. Zuganelis preserved petitioner's sweater after claiming to see a boot print on the chest. A boot print is not an injury, but it would help corroborate petitioner's claim that he was kicked in the chest. When Zuganelis was shown

the sweater at trial, he admitted that he could not see a boot print. Nor is the boot print evident in a photo of petitioner wearing the sweater at Area 4, though the photo is somewhat grainy.

¶ 144   Lastly, EMT Hamilton testified that he did not observe any bruises or swelling during the jail-intake exam. Then again, Hamilton's exam was limited, from the waist up, and thus did not cover all of the areas in which petitioner claimed to be kicked or punched. And an EMT is not a physician. The bond-court judge granted petitioner's immediate request to be sent to the hospital for a proper medical exam, but the jail personnel—the State's own agents—ignored the court's order for three weeks.

¶ 145   The TIRC fairly observed that petitioner was thus deprived of any chance he may have had to counter Hamilton's testimony. And even trained medical personnel have been known to reach and document conflicting conclusions about the presence of bruises and swelling. See *id.* ¶¶ 56-57. So Hamilton's testimony, while no doubt important evidence, does not decisively refute petitioner's allegations.

¶ 146   Then there is Judge Maloney, the corrupt judge who presided over petitioner's suppression hearing and jury trial. This was Maloney's last case before Operation Graylord forced him to "exchange his judge's robe for the garb of a prisoner at a federal correctional institution." *Bracy*, 286 F.3d at 407-08. We would be confident in the result of our threshold review even without broaching this topic. But the State claims that Maloney's corruption is irrelevant to petitioner's TIRC claim and deserves no consideration in this context. One of the State's own arguments shows why he is relevant, though far from central, to petitioner's claim.

¶ 147   The State argues that "the clear credibility findings of the judge at the suppression motion

and the jury's verdict *** significantly further rebut Petitioner's claims of torture." If a finding or a verdict from the underlying criminal case could "rebut" a claim of torture, there would be no such thing as a claim of torture, at least not one that could ever receive an evidentiary hearing.

¶ 148   Still, we understand that, generally, a judge's post-hearing finding that a witness was credible is a point in the witness's favor. The same goes for a jury's verdict, if the witness testified at trial to the issue at hand. So these findings could be taken to support the credibility of the detectives' sworn denials of petitioner's allegations at the suppression hearing and trial.

¶ 149   But the State never reckons with the assumption that underlies its argument. A judge's credibility finding is usually a point in a witness's favor because we ordinarily presume that it resulted from a good-faith exercise of the judicial function.

¶ 150   The State acts as if Maloney is entitled to this presumption because petitioner did not bribe him. That misses the point. The usual presumption that Maloney honestly discharged his judicial duties would be "rebutted" by evidence that his handling of the case was infected by "compensatory[ ]bias." *Bracy*, 520 U.S. at 909; see *Gacho v. Wills*, 986 F.3d 1067, 1069 (7th Cir. 2021) (discussing Judge Maloney's " 'compensatory' or 'camouflaging' bias": "Maloney's willingness to take bribes for acquittals had a sinister flip side. To deflect suspicion from his criminal scheme and give defendants an incentive to cough up bigger bribes, Maloney built a reputation as one of the most ruthless judges on the Cook County bench.").

¶ 151   And the Shields affidavit, taken at face value at this preliminary stage, is evidence that Maloney steered the jury's verdicts toward the State. If the Shields affidavit is believed—to be determined later—then petitioner has a colorable argument that Maloney's credibility findings

deserve no weight at all. As the TIRC noted, there is also evidence that Maloney was aware of the federal investigation while presiding over this case.

¶ 152   Neither Maloney's corruption nor Shields's account of his behavior at trial mean that petitioner was tortured. But they exemplify the point that a constitutional claim (here, judicial misconduct) and its attendant facts may provide context for evaluating a statutory claim of torture, even if these facts do not directly establish torture. *Fair*, 2024 IL 128373, ¶¶ 84-88.

¶ 153   In sum, the TIRC's decision that there is sufficient evidence of torture to warrant an evidentiary hearing was not against the manifest weight of the evidence. The evidence pulls in opposite directions, and nearly everyone's credibility is at issue. Petitioner's claim cannot be summarily dismissed without an evidentiary hearing.

¶ 154                                         II

¶ 155   The State also argues that petitioner's TIRC claim was properly dismissed because his allegations, even if accepted as true, would not amount to a claim of "torture." As defined by the TIRC Act, a " '[c]laim of torture' " requires that a petitioner (1) "was tortured" (2) "into confessing to the crime for which [he] was convicted" and that (3) "the tortured confession was used to obtain the conviction." 775 ILCS 40/5(1) (West 2022); *Fair*, 2024 IL 128373, ¶ 63. The State argues that petitioner cannot satisfy the first two requirements, because his alleged abuse was not torture, and his statement was not a confession.

¶ 156                                         A

¶ 157   In the State's view, the acts of abuse alleged by petitioner fall short of torture, "under the standard announced" by our supreme court in *Fair*, 2024 IL 128373. But *Fair* did not

"announce" a new standard of torture; it simply approved of the definition adopted by the TIRC in an administrative rule and applied in our cases. See *Gibson II*, 2019 IL App (1st) 182040-U, ¶¶ 42-43. The TIRC's rule defines torture as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for the purpose of obtaining from that person a confession to a crime." 20 Ill. Adm. Code 2000.10 (2017).

¶ 158   In *Fair*, 2024 IL 128373, ¶¶ 72-73, 82, our supreme court approved of this definition, noting that it "aligns well with the dictionary definitions," and emphasized two points that are evident from the TIRC's rule. First, torture can result in severe mental pain, physical pain, or a mix of the two. *Id.* ¶ 73. Second—as the State argues here—some acts of physical abuse may prove too minor and inconsequential to count as torture. *Id.* ¶ 82.

¶ 159   The holding of *Fair* was not that the alleged physical abuse wasn't torture but that the alleged physical abuse never happened, or at least that the circuit court did not err in finding the petitioner and his allegations " 'wholly incredible.' " *Id.* ¶ 92. As a result, *Fair* had no occasion to apply this point to its own facts. For all the State's talk of the "the standard announced in *Fair*," the decision simply directs us to apply the TIRC's administrative rule for ourselves.

¶ 160   Since *Fair* does not offer an example of physically abusive conduct that falls short of torture, we will offer one of our own: an officer brusquely pushes a defendant, perhaps while handcuffed, into a chair in the interrogation room. That is abusive and unbecoming of an officer and may be part of a broader pattern of conduct meant to intimidate and coerce the suspect—but it generally will not count, by itself, as torture, since it is not the kind of physical abuse that ordinarily causes "severe pain or suffering." 20 Ill. Adm. Code 2000.10 (2017).

¶ 161   Petitioner alleges that he endured at least six rounds of physical abuse over the course of a day and a half. He was repeatedly hit in the head; kicked in the side, chest, and legs; "chopped" in the neck; punched and kneed in the stomach; and punched in the ribs and back. And in one of the last acts of physical abuse, before petitioner hit his breaking point, Summerville kicked him "between [his] legs" with his "hard boots."

¶ 162   We would undoubtedly expect a beating like this to cause severe physical pain, not to mention mental anguish. The detectives did not merely shove petitioner into a chair or anything along those lines. They repeatedly beat him with their fists and feet, and even kicked him in the genitals, for the purpose of obtaining a confession. Or so he alleges. If his allegations are deemed credible, the TIRC Act offers him a remedy.

¶ 163                                         B

¶ 164   The TIRC Act's remedies are available to a petitioner who made a "tortured confession." 775 ILCS 40/5(1) (West 2022). The State argues that petitioner did not "confess" to the murders; he merely "made inculpatory statements." His remarks were incriminating, says the State, but they did not amount to a full confession to all elements of the crime, as the TIRC Act requires.

¶ 165   First of all, petitioner did not just "ma[k]e some inculpatory statements" or admit a few potentially incriminating facts. He fully confessed to the murders—more specifically, that he was accountable for them as the getaway driver. The State's successful theory was that petitioner "aid[ed]" or "agree[d]" to aid the shooters, "either before or during" the murders, and that he did so "with the intent to promote or facilitate" the murders. 720 ILCS 5/5-2(c) (West 2022).

¶ 166   Petitioner admitted in his statement that he attended the meeting at which the plan to kill

Smitty's crew was hatched, that he knew Washington and Jet were armed with Uzis when they got into the car, that he drove them around looking for the victims, and that he waited for them to carry out the plan and return to the car so he could drive them away. Petitioner thus admitted every element of the State's accountability theory: that he aided (and agreed to aid) the shooters before the shooting took place and that he did so deliberately, knowing full well what his fellow gang members were up to.

¶ 167   An admission of accountability for a principal's offense is an admission of one's own guilt for that offense. See *id.* § 5-1. In short, petitioner fully admitted his guilt—not in those exact words, of course, but he admitted everything the State needed to convict him. If that is not enough for a confession, then we don't know what is.

¶ 168   In any event, after briefing closed in this matter, our supreme court issued an opinion rejecting the very argument made here by the State—that a "tortured confession" can only refer to a full confession to all elements of the crime and nothing less. In *People v. Muhammad*, 2025 IL 130470, ¶ 44, the court found the State's interpretation of the phrase "tortured confession" to be "inconsistent with the purpose and remedial nature of the" TIRC Act.

¶ 169   The court opined that "providing relief only when the torture results in revealing all elements of the crime and not just inculpatory evidence in general would do a disservice to the act's purpose." *Id*. The court thus held that the phrase "tortured confession" was *not* limited to full confessions but, per the TIRC administrative rule, included "not only incriminating statements but also incriminating vocalizations and gestures," as well as "statements the convicted person denies making but the police or prosecutors have alleged the convicted person

did make." *Id.* ¶ 45.

¶ 170   So even if the State were correct that petitioner's statement was less than a full confession, our supreme court has clarified that his statements to the police easily fell within the jurisdiction of the TIRC Act.

¶ 171                                                CONCLUSION

¶ 172   The judgment of the circuit court, dismissing petitioner's claim of torture under the TIRC Act, is reversed. The cause is remanded for an evidentiary hearing.

¶ 173   Reversed and remanded.

***People v. Murray*, 2025 IL App (1st) 232338**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 88-CR-02309(02); the Hon. David M. Carlson, Judge, presiding. |
| **Attorneys for Appellant:** | Karl Leonard, Lauren Myerscough-Mueller, and Lyla Wasz-Piper, of The Exoneration Project at the University of Chicago Law School, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Maria McCarthy, Special State's Attorney, of McCarthy & Valentini, LLC, of Oak Brook, Alan J. Spellberg, Assistant Special State's Attorney, of Highland Park, and Paul A. Castiglione, Assistant Special State's Attorney, of Khowaja Law Firm, LLC, of Chicago, for the People. |